IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
May 29, 2013 Session Heard at Cookeville[1]


**STATE OF TENNESSEE v. TERRANCE ANTONIO CECIL**


**Appeal by Permission from the Court of Criminal Appeals
Circuit Court for Maury County
No. 20194     Robert L. Jones, Judge**

_____

**No. M2011-01210-SC-R11-CD - Filed August 12, 2013**

_____


The defendant was convicted of false imprisonment and assault. The trial court imposed concurrent sentences of six months, with all but sixty days suspended to probation. More than one year after the trial but while the defendant's case was pending in the Court of Criminal Appeals, this Court filed its opinion in State v. White, 362 S.W.3d 559 (Tenn. 2012), which requires, on grounds of due process, trial courts to provide a more specific instruction on kidnapping charges as to whether the removal or confinement of a victim is essentially incidental to any accompanying offense. The Court of Criminal Appeals held in this instance that, although the White instruction was not provided at trial, the jury was correctly instructed and the evidence was sufficient to support both convictions. We granted review to determine whether the absence of the White instruction warrants a new trial. Because the omission of the instruction required by White cannot be classified as harmless beyond a reasonable doubt, the conviction for false imprisonment is reversed and the cause remanded for a new trial.


**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed in Part and Reversed in Part; Case Remanded to the Circuit Court for Maury County**


GARY R. WADE, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER, CORNELIA A. CLARK, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Kevin Richard McGee, Nashville, Tennessee, and Larry Samuel Patterson, Jr., Columbia, Tennessee, for the appellant, Terrance Antonio Cecil.

---

[1] Oral argument was heard in this case on May 29, 2013, in Cookeville, Putnam County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Rachel West Harmon, Assistant Attorney General; Leslie E. Price, Senior Counsel; Mike Bottoms, District Attorney General; and Daniel J. Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts and Procedural History**

At approximately 3:30 a.m. on June 26, 2010, police officers in Maury County, Tennessee, responded to an "open-line 911 call"[2] from 607 ½ Santa Fe Pike, later identified as the trailer residence of Terrance Antonio Cecil (the "Defendant"). The police arrived at the scene, knocked on the door and windows, and waited several minutes before the Defendant allowed them to enter the residence. When the police walked into the back bedroom, they found the victim, Robyn Robledo, who appeared to have swelling on her eye, shoulder, and temple. After interviewing both the victim and the Defendant, the police arrested the Defendant and called an ambulance to transport the victim to a hospital. Later, a Maury County grand jury indicted the Defendant for domestic assault and false imprisonment.[3]

At the trial on February 10, 2011, Officer Keith Fall of the Columbia Police Department testified that he arrived at the Defendant's trailer at 3:38 a.m. Although he was not the first officer on the scene, no one else had entered the trailer before his arrival. According to Officer Fall, he knocked on the door of the trailer and waited for approximately ten minutes before the Defendant answered. When Officer Fall asked the Defendant if anyone else was inside, he answered that his "old lady" was also there but that everything was "okay." The Defendant then allowed Officer Fall to enter his residence in order to speak with the victim, and, when Officer Fall found the victim lying on the bed in a bedroom at the back of the trailer, the victim motioned to Officer Fall in a manner that he interpreted as a request to speak privately. He escorted the victim into the living room while the Defendant remained in the bedroom with other officers. After speaking with the victim and observing slight discoloration and swelling around her eye, and bruises on the right side of her temple and on her right shoulder, Officer Fall called an emergency medical services unit to transport the victim to Maury Regional Hospital and placed the Defendant under arrest for domestic assault and false imprisonment.

---

[2] At trial, the testifying officer explained that an "open-line 911 call" is "where a caller calls 911 and the dispatcher's answering the phone and nobody answers back, [and the dispatcher says] what's your emergency and there's . . . an open line, but nobody responding to the dispatcher's questions."

[3] See Tenn. Code Ann. §§ 39-13-111 (domestic assault), -302 (false imprisonment) (2010).

The victim testified that she had been dating the Defendant off and on for seven months at the time of their altercation. She explained that they had been engaged to marry but had broken off and then renewed the engagement several times throughout their "complicated relationship." The victim recalled that on the day prior to his arrest, she and the Defendant had exchanged angry text messages. After leaving her place of work shortly after 10:00 p.m., she first drove to her home to shower. Afterward, she traveled to the Defendant's residence in order to confront him about his infidelity, to return her set of engagement rings, and to end their relationship. The victim estimated that she arrived at the Defendant's trailer around midnight and recalled that Shaun Walls, a friend of the Defendant, answered the door. According to the victim, she walked into the Defendant's bedroom and engaged him in a conversation that began cordially but escalated into an argument when the Defendant became rude. She recalled that they quarreled for "quite some time," and that when she eventually tried to leave the trailer, the Defendant said, "[Y]ou're not going anywhere." She stated that the Defendant then "came after" her, "grabbed" her, and threw her on the bed, where they began hitting one another. After an exchange of multiple blows, she was able to "kick[] [the Defendant] hard enough to get him off of [her]." When she again attempted to leave, however, the Defendant "grabbed" her by the hair and threw her to the floor. The victim recounted that the Defendant "slid" her into the bathroom, "slammed" her against the bathtub, and threatened to "kick [her] in [the] face." According to the victim, the Defendant eventually "let [her] get up and that was pretty much it." She estimated that she attempted to leave a total of three times during the altercation and that the Defendant struck her "over a dozen times."

The victim further acknowledged that she had ripped the shirt the Defendant had been wearing during the altercation, and that when he went to the laundry room to put on another shirt, she used her cell phone to call 911, turning off the backlight and volume so the Defendant could neither see the phone nor hear the dispatcher's voice. She testified that she "didn't want [the Defendant] to get even more mad that [she] had called the police" and further explained that she stayed in bed with the Defendant while they both "calmed down." The victim stated that approximately fifteen minutes passed before the police arrived. She recalled that when they initially heard the knock at the door they speculated that it may have been a neighbor. When there was no response to the knocks on the door, however, the police began "banging on the windows" and said, "[T]his is the police, open up the door." She testified that the Defendant "wouldn't let [her] get up and answer the door" and that "a good ten minutes" passed before he finally responded. After being separated from the Defendant, the victim provided a statement to the police, who examined her injuries. As she was taken to the hospital by ambulance, she learned that the Defendant had been taken into police custody. The victim underwent several tests at the hospital, including a CAT scan and an X-ray. She testified that she had a large knot on her right shoulder and that her right temple, ear, and eye were swollen from being "hit about five times" on the head. She also developed

bruising and swelling in her upper neck, throat, jaw, and chin areas, and, after the incident, she returned to the hospital on two different occasions for treatment of "major headaches," blurred vision, and other symptoms in her right eye.

The victim estimated that the actual physical altercation with the Defendant lasted about an hour and a half. She did not recall inflicting any wounds. The victim admitted that she contacted the Defendant several months after the incident, claiming that she was seeking financial assistance rather than attempting to rekindle their relationship. She explained that as a single mother of three children with no family or friends in the area, she had relied on the Defendant for financial assistance in the past.

On cross-examination, the victim acknowledged several inconsistencies between her testimony on direct examination and the statement she had provided to the police on the night of the altercation. She admitted that her testimony was equivocal as to whether she could have left the Defendant's residence before, during, or immediately after the altercation, and recalled that she had blacked out during the altercation, not because of a blow by the Defendant, but "because [she] was in a rage." She could not, therefore, recall "who hit first" and was uncertain about some of the other details. When asked whether the Defendant had a bloody lip, she responded, "Well, me punching him several times, I'm sure . . . he got bloody somewhere." She conceded that when she was younger, she had been given the nickname "Gangstaboo" because of her involvement in "a lot of fighting situations," during which she had a tendency to black out because of her "anger state of mind." The victim also acknowledged that three days after the altercation, she sent a text message to the Defendant stating, "If I get in trouble for being around you, I'm beating your ass again." She further stated that several weeks after the incident she "got drunk and . . . ended up over at [the Defendant's] house," and that in November or December of 2010 she again returned to the Defendant's residence with other friends. The victim was also shown a text message that she sent to the Defendant on November 26, 2010, some five months after the altercation: "[C]an I come lay with you tonight, . . . I want to be in your arms, I mean that[.]" She acknowledged that she had been prescribed Xanax and Celexa for anxiety attacks and recalled taking Celexa on the morning before the encounter that led to the Defendant's arrest, but denied consuming any alcohol or taking any Xanax or "off-the-street drugs."

Shutane "Shaun" Walls, who had been "good friends" with the Defendant for fifteen or sixteen years, testified in his defense. He recalled that he arrived at the Defendant's trailer between 12:00 and 12:30 a.m. on June 26, 2010, and that the victim arrived about an hour or an hour and a half later. According to Walls, when he answered the door for the victim, "she just went straight back into [the Defendant's] room." Walls recalled that the victim remained in the bedroom with the Defendant for some fifteen or twenty minutes, left the trailer, and then returned some five minutes later. After watching television for another

-4-

fifteen minutes, Walls retired to a second bedroom located on the opposite end of the trailer and fell asleep. He estimated that an hour had passed before he discovered that the police were in the living room. He claimed that upon seeing the police, he went back to sleep because he "didn't want no part of it." Although Walls admitted that he was a "pretty sound sleeper," he testified that he did not hear any argument, screaming, yelling, or fighting between the victim and the Defendant.

Rachel Thomas, who was dating Walls in 2010, also testified for the defense. She and the victim had become friends while working together at Sun Tan City, but they had not been in close contact since the incident. Although she was in Seattle at the time of the altercation, Thomas recalled that the victim had sent her a text message detailing her version of the events. Thomas acknowledged that, after the incident, she saw the victim's bruises on her right shoulder, cheek, and eye, and she also testified that she was present when the victim and the Defendant went into his bedroom together shortly after Thanksgiving in 2010. Donna Howell testified that she had been friends with the victim at the time of the incident and had previously lived with her. Although called as a witness for the defense, on cross-examination, Howell identified several photographs depicting the victim's injuries, and she recalled observing the victim's injuries on the day following the altercation.

At the conclusion of the proof, the jury returned verdicts of guilt for assault and false imprisonment.[4] On March 4, 2011, the trial court sentenced the Defendant to concurrent sentences of six months, with sixty days to be served in confinement and the remaining four months suspended on each sentence, followed by ten months on supervised probation. The trial court later denied the Defendant's motion for a new trial.[5] On direct appeal to the Court of Criminal Appeals, the Defendant challenged the sufficiency of the evidence, alleged a sentencing error, and argued that the trial court committed plain error by failing to instruct the jury on the lesser included offenses of attempted assault and attempted false

---

[4] See Tenn. Code Ann. §§ 39-13-101 (assault), -302 (false imprisonment) (2010). As noted, the grand jury indicted the Defendant on charges of domestic assault and false imprisonment. On the petit jury's verdict form, however, the word "domestic" was struck from the assault charge. The record reflects that the trial court had determined before trial "that this was not a domestic type situation," the case proceeded on a simple assault charge, and the jury returned verdicts of guilt as to simple assault and false imprisonment, both of which are Class A misdemeanors. See id. §§ 39-13-101(b)(1), -302(b).

[5] In his motion for a new trial, the Defendant raised four issues, which we have summarized as follows: (1) whether the evidence was sufficient to support his convictions of simple assault and false imprisonment; (2) whether the trial court erred by considering his prior charges, which did not result in convictions, during the sentencing hearing; (3) whether the trial court should have instructed the jury on the lesser included charges of attempted assault and attempted false imprisonment; and (4) whether the jury selection process violated his right to a fair and impartial trial by a jury of his peers because there was an inadequate representation of African Americans.

imprisonment. The Court of Criminal Appeals found no error on the issues presented, State v. Cecil, No. M2011-01210-CCA-R3-CD, 2012 WL 2674521, at *1 (Tenn. Crim. App. July 6, 2012), but did address our recent holding in State v. White, 362 S.W.3d 559, 580-81 (Tenn. 2012), which requires trial courts, under circumstances such as these, to provide a specific instruction to the jury designed to ascertain whether the nature of the confinement constitutes a substantial interference with the victim's liberty. Although the instruction required by our opinion in White (which was filed more than one year after the trial in this case) was not provided, the Court of Criminal Appeals found no error and ruled that the evidence sufficiently supported the assault and false imprisonment convictions. Cecil, 2012 WL 2674521, at *6-7. Although the Defendant raised several issues on appeal to this Court, we granted review to determine whether the instruction recently adopted in White requires a new trial.

## II. Analysis

In the order granting this appeal, we stated the issue as "[w]hether, in analyzing the sufficiency of the evidence in light of State v. White, 362 S.W.3d 559 (Tenn. 2012), the Court of Criminal Appeals erred in holding that the jury was correctly instructed and that the [Defendant's] due process rights were not violated." While the Defendant argues error and further contends that if the instruction set out in White had been given the jury would not have convicted him of false imprisonment, the State concedes that the Court of Criminal Appeals erred by holding that the trial court correctly instructed the jury on the false imprisonment charge. The State argues, however, that the instructional error was harmless beyond a reasonable doubt. In order to appropriately consider this issue, we have reviewed the history of this area of the law, our holding in White, and several opinions by the Court of Criminal Appeals that have addressed the White instruction, particularly those that conducted a harmless error analysis.

## A. History

False imprisonment, which has been described as the definitional "building block" of our kidnapping offenses, is committed when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a); see Melanie A. Prince, Comment, Two Crimes for the Price of One: The Problem with Kidnapping Statutes in Tennessee and Beyond, 76 Tenn. L. Rev. 789, 791 (2009); see also Tenn. Code Ann. § 39-13-302 sentencing commission cmts. (describing false imprisonment as "the basic offense for the kidnapping statutes"). "[F]alse imprisonment is meant to 'broadly address[] any situation where there is an interference with another's liberty,'" White, 362 S.W.3d at 574-75 (second alteration in original) (quoting Tenn. Code Ann. § 39-13-302 sentencing commission cmts.), while the increasingly serious levels of kidnapping consist of false imprisonment plus a combination of aggravating factors, such as a risk of bodily injury or use of a deadly weapon, that may elevate the crime to kidnapping,

aggravated kidnapping, or especially aggravated kidnapping, see Tenn. Code Ann. §§ 39-13-303 to -305 (2010). Because the basic element of false imprisonment—removing or confining so as to interfere substantially with another person's liberty—serves as the foundation for each of the kidnapping offenses as defined by our statutes, it follows that our review in this instance requires consideration of not only our statutory scheme but also the related kidnapping opinions of this Court over the past twenty-two years.

In State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), the Court considered, as issues of first impression, "the propriety of a kidnapping conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape," and "what legal standard should be applied in deciding whether a separate conviction for kidnapping can be sustained." Id. at 300.[6] At the time, kidnapping was defined as a "false imprisonment . . . [u]nder circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303(a)(1) (1990) (amended 2008). False imprisonment was defined then as it is today—i.e., the unlawful removal or confinement of another so as to interfere substantially with the other's liberty. Id. § 39-13-302(a) (1990). As the Court in Anthony observed, "[l]iterally construed, the offense of kidnapping defined in these statutes at times could . . . overrun several other crimes, notably robbery and rape, and in some circumstances assault, since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes." 817 S.W.2d at 303. The problem with the kidnapping statutes identified in Anthony was resolved on state constitutional principles of due process, with the Court concluding that the "kidnapping statutes do not apply to unlawful confinements or movements incidental to the commission of other felonies." Id. at 305; see also id. at 306 ("We rest this holding not on a concern for constitutional protection against double jeopardy, but on our understanding of the constitutional guarantee of due process. In this regard, we note specifically the provisions of [a]rticle I, section 8 of the Tennessee Constitution."). While directing courts to construe the kidnapping statutes narrowly so as to be fundamentally fair and consistent with due process rights, the Court defined the relevant test as

> whether the confinement, movement, or detention is essentially incidental to
> the accompanying felony and is not, therefore, sufficient to support a separate

---

[6] Since Anthony was decided, this Court has tended to use the specific terms "kidnapping" and "accompanying felony" when discussing these issues. We have also mentioned rape and robbery as the most common examples of these accompanying felonies. Of course, because each of the kidnapping offenses is rooted in the definition of false imprisonment, our decisions as to any of the kidnapping offenses would apply with equal force to the offense of false imprisonment. Likewise, the additional offense that may accompany the false imprisonment, kidnapping, aggravated kidnapping, or especially aggravated kidnapping offense will not always be a felony and will not always be rape or robbery. Indeed, the Defendant in this instance was convicted of false imprisonment and the accompanying offense of assault, a Class A misdemeanor.

conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction.

Id. The Court emphasized that "[t]he test is not whether the detention was an 'integral part or essential element' of the [accompanying offense], but whether it was 'essentially incidental' to that offense." Id. at 307.

Six years after the Anthony ruling, in State v. Dixon, this Court modified the "essentially incidental" due process analysis. 957 S.W.2d 532 (Tenn. 1997). In Dixon, the Court properly observed that "Anthony and its progeny . . . are not meant to provide the rapist a free kidnapping merely because he also committed rape," and described the "essentially incidental" standard as designed to "only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery." Id. at 534-35. The Court further stated that "any restraint in addition to that which is necessary to consummate rape or robbery may support a separate conviction for kidnapping." Id. at 535. Accordingly, the two-part Dixon test addressed (1) whether the movement or confinement of the victim was beyond that necessary to consummate the accompanying crime; and (2) whether the additional movement or confinement prevented the victim from summoning help, lessened the defendant's risk of detection, or created a significant danger or increased the victim's risk of harm. State v. Richardson, 251 S.W.3d 438, 442-43 (Tenn. 2008). Under the first prong of the Dixon test, the distance of the victim's movement and the duration or place of the victim's confinement were identified as factors to be considered when determining if the movement or confinement was beyond that necessary to consummate the accompanying crime. Id. at 443. The second prong was to be addressed only if the threshold inquiry in the first prong was satisfied. Id. at 442. When each of the criteria was met, a separate kidnapping conviction was permitted to stand. In Richardson, we explicitly recognized the Dixon two-part test as a replacement for the Anthony "essentially incidental" analysis. Id. at 443.

Just last year, in State v. White, we revisited our rulings in this area of the law and determined that the separate due process test articulated first in Anthony, and subsequently refined in Dixon and its progeny, was not the most workable manner of addressing a kidnapping conviction that accompanied a separate offense. White, 362 S.W.3d at 578. After overruling Anthony and the entire line of cases that included a separate due process analysis in appellate review,[7] we adopted a standard under which trial courts have an

_____

[7] Id. at 570, 578 (overruling, among other cases, State v. Cozart, 54 S.W.3d 242 (Tenn. 2001), and State v. Fuller, 172 S.W.3d 533 (Tenn. 2005)). In Cozart, 54 S.W.3d at 244, the trial court rejected the
(continued...)

obligation to fully instruct the jury on the statutory language of the kidnapping statutes, holding that "whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law," White, 362 S.W.3d at 577, with the appellate courts assessing the sufficiency of the convicting evidence as the ultimate component of due process protections, id. at 578. We further explained that

> [w]hen jurors are called upon to determine whether the State has proven beyond a reasonable doubt the elements of kidnapping, aggravated kidnapping, or especially aggravated kidnapping, trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction. In our view, an instruction of this nature is necessary in order to assure that juries properly afford constitutional due process protections to those on trial for kidnapping and an accompanying felony.

Id. We also cautioned, however, that our decision "should not be construed as creating a new standard for kidnapping. Instead, we . . . merely provid[ed a] definition for the element of the offense requiring that the removal or confinement constitute a substantial interference with the victim's liberty." Id. We then provided an appropriate instruction as to the "substantial interference" element, which was subsequently adopted by the Tennessee Pattern Jury Instruction Committee:

> To find the defendant guilty of *[especially] [aggravated] [kidnapping] [false imprisonment]*, you must also find beyond a reasonable doubt that the removal or confinement was to a greater degree than that necessary to commit the offense(s) of _____ as charged *[or included]* in count(s) _____. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:

---

[7](...continued)
defendant's request for a special jury instruction based on Anthony. Adhering to the view that the due process analysis stemming from Anthony was "purely a question of law," this Court agreed with the trial court's refusal to submit the requested instruction to the jury. Id. at 247. In Fuller, this Court stated that the first Dixon prong did "not replace the 'essentially incidental' test," but was merely a "threshold determination," and that the Dixon analysis as a whole "provide[d] the structure necessary for applying the principles announced in Anthony." Fuller, 172 S.W.3d at 537. The Court also explained that satisfaction of the second Dixon prong was not dependent upon "the ultimate success of the confinement," id., and "emphasize[d] that 'the determination of whether a detention or movement is incidental to another offense is highly dependent on the facts in each case,'" id. at 538 (quoting Anthony, 817 S.W.2d at 306).

-9-

(a) the nature and duration of the alleged victim's removal or confinement by the defendant;

(b) whether the removal or confinement occurred during the commission of the separate offense;

(c) whether the interference with the alleged victim's liberty was inherent in the nature of the separate offense;

(d) whether the removal or confinement prevented the alleged victim from summoning assistance, although the defendant need not have succeeded in preventing the alleged victim from doing so;

(e) whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

(f) whether the removal or confinement created a significant danger or increased the alleged victim's risk of harm independent of that posed by the separate offense.

Unless you find beyond a reasonable doubt that the alleged victim's removal or confinement exceeded that which was necessary to accomplish the alleged _____ and was not essentially incidental to it, you must find the defendant not guilty of *[especially] [aggravated] [kidnapping] [false imprisonment]*.

7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 8.01–.03, 8.05 (footnote omitted) (citing White, 362 S.W.3d at 578-81). In White, we concluded that even though the jury instructions by the trial court tracked the language of the relevant kidnapping statute, they were deficient because "they did not define the key element—the substantial interference with the victim's liberty—as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." 362 S.W.3d at 580. Determining that "th[e] proof could be interpreted in different ways," we reversed the conviction and remanded for a new trial so that the trial court could properly instruct the jury to consider, as a question of fact, whether the removal or confinement of the victim constituted a substantial interference with her liberty, id. at 579, 581.

## B. Application of White

In the seventeen months since our ruling in White, the Court of Criminal Appeals has grappled with a variety of kidnapping cases that were in the "appellate pipeline" at the time the opinion in White was filed. Initially, our decision did not "creat[e] a new standard for kidnapping," and, in consequence, "d[id] not articulate a new rule of constitutional law or require retroactive application." Id. at 578. There was a question as to whether this Court intended White to be applied to any cases that were pending direct appeal or to be limited to those trials held after the filing of the White opinion on March 9, 2012. As the Court of

Criminal Appeals properly observed in State v. Osby, our statement in White was not intended to preclude consideration of the newly required instruction in cases already in the various stages of the appellate process. No. W2012-00408-CCA-R3-CD, 2012 WL 5381371, at *7 (Tenn. Crim. App. Nov. 2, 2012) ("We note . . . that the [supreme] court has remanded a number of cases for reconsideration in light of its ruling in White, suggesting that it intended . . . application of the ruling to those already-tried cases in the appellate pipeline, that is[,] pending direct appeal[] at the time it was filed[,] and that its use of the word 'retroactive' was intended to prevent use of the ruling for collateral attack." (citation omitted)), perm. app. denied (Tenn. Mar. 5, 2013). Because this case was on direct appeal at the time White was decided, the issue has been preserved, and the Defendant is entitled to the benefit of our ruling. See Lease v. Tipton, 722 S.W.2d 379, 379 (Tenn. 1986) (per curiam) (adopting the "pipeline approach," which applies a new legal principle "to the litigants at bar, to all actions pending on the date the decision announcing the change becomes final[,] and to all causes of action arising thereafter").

Relying upon the separate due process analysis articulated in Anthony, the Defendant argued to the Court of Criminal Appeals that the false imprisonment was "essentially incidental" to the assault, and, therefore, the evidence was insufficient to support both convictions. Cecil, 2012 WL 2674521, at *5 & n.2. The Court of Criminal Appeals found this argument to be without merit because Anthony had been overruled by White, and made the following further observation:

> For the Defendant's argument to succeed under White, we would have to conclude that the conduct by the Defendant that "removed or confined" the victim unlawfully so as to "interfere substantially" with the victim's "liberty" did not exceed that which was necessary to accomplish the assault. See [Tenn. Code Ann.] § 39-13-302 (2010). . . . The evidence is sufficient beyond any reasonable doubt that the Defendant committed the offense of falsely imprisoning the victim. The evidence is also clearly sufficient to support the jury's verdict that the Defendant assaulted the victim.

Id. at *6. The Court of Criminal Appeals found no error at all, concluding that "[t]he jury was correctly instructed." Id. at *7.

Although some panels of the Court of Criminal Appeals have similarly administered a simple sufficiency of the evidence analysis in post-White cases, other panels of the court have properly found that the absence of the White instruction constitutes error. Compare State v. Savage, No. M2011-00666-CCA-R3-CD, 2012 WL 4054814, at *15-16 (Tenn. Crim. App. Sept. 17, 2012), perm. app. denied (Tenn. Jan. 22, 2013); Cecil, 2012 WL 2674521, at *6-7, perm. app. granted (Tenn. Nov. 29, 2012); and State v. Young, No.

E2012-00726-CCA-RM-CD, 2012 WL 2465156, at *11-13 (Tenn. Crim. App. June 28, 2012), perm. app. denied (Tenn. Nov. 21, 2012),[8] with State v. Scott, No. E2011-00707-CCA-R3-CD, 2012 WL 5503951, at *13 (Tenn. Crim. App. Nov. 14, 2012) (observing that this Court "acknowledged [in White] that the sufficiency of the evidence could not be evaluated in the absence of proper jury instructions on the affected issue"), perm. app. denied (Tenn. Mar. 5, 2013); and Osby, 2012 WL 5381371, at *8 & n.3 (same). While we did state in White that "[o]ur task . . . of assessing the sufficiency of the convicting evidence qualifies as the ultimate component of th[e due process] constitutional safeguard," 362 S.W.3d at 578, we also declined to review the sufficiency of the evidence because the jury had not received an adequate instruction, id. at 579. We explained that the jury, whose primary obligation is to ensure that a criminal defendant has been afforded due process, must first be properly instructed under the law in order to determine whether the State has proven the defendant's guilt as to each and every element of kidnapping beyond a reasonable doubt. Id. at 577. In our view, therefore, providing the definition of the "substantial interference" element to the jury is essential to afford the protections of due process. Only when the jury is properly instructed can appellate review of the sufficiency of the convicting evidence satisfy the due process safeguard.[9]

Although the Court of Criminal Appeals found that the jury was correctly instructed in this case, we must disagree. The State has properly conceded this point. The same instructional error that existed in White is present in this case—the jury was not adequately charged on the question of whether the victim's removal or confinement, as an element of false imprisonment, was essentially incidental to the assault.[10] In White, we held that even

---

[8] In Young and Savage, although we denied the defendants' applications for permission to appeal, we also designated those opinions of the Court of Criminal Appeals "not for citation." See Tenn. Sup. Ct. R. 4(E). As indicated, we granted review in this case to determine "[w]hether, in analyzing the sufficiency of the evidence in light of State v. White, 362 S.W.3d 559 (Tenn. 2012), the Court of Criminal Appeals erred in holding that the jury was correctly instructed and that the [Defendant's] due process rights were not violated."

[9] As the Court of Criminal Appeals has observed,

[b]ecause the due process issue at stake is now deemed a factual issue to be determined by the trier of fact and not a legal issue to be determined by the trial court, an appellate court that embarks upon determining the 'sufficiency of the evidence' on this issue despite the absence of the necessary, enabling instruction usurps the role of the trier of fact.

Osby, 2012 WL 5381371, at *8 n.3 (emphasis added) (citation omitted).

[10] The instruction on assault required the jury to find that the State had proven "beyond a reasonable doubt that the [D]efendant intentionally, knowingly, or recklessly caused bodily injury to another." The

(continued...)

-12-

though the jury instructions tracked the language of the kidnapping statute, they were erroneous because "they did not define the key element—the substantial interference with the victim's liberty—as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." 362 S.W.3d at 580 (emphasis added).

Of importance, "[t]he failure to instruct the jury on a material element of an offense is a constitutional error subject to harmless error analysis." State v. Faulkner, 154 S.W.3d 48, 60 (Tenn. 2005) (emphasis added) (citing State v. Ducker, 27 S.W.3d 889, 899 (Tenn. 2000)); see also State v. Garrison, 40 S.W.3d 426, 434 (Tenn. 2000) (holding that "harmless error analysis is appropriate when evaluating omissions of an essential element of an offense from the jury charge"). In consequence, the lack of the instruction set out in White, while entirely understandable because the trial predated our ruling, qualified as constitutional error. The Court of Criminal Appeals should have addressed whether the error was harmless beyond a reasonable doubt.[11] See State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) ("The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless."). In order to determine whether an instructional error is harmless, the appellate court must ask "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. (quoting State v. Allen, 69 S.W.3d 181, 190 (Tenn. 2002)) (internal quotation marks omitted); see also White, 362 S.W.3d at 580 n.20 ("Because we cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the instructional error, we cannot find the error harmless."). As we observed in White, the touchstone of this inquiry is whether a rational trier of fact could interpret the proof at trial in different ways. 362 S.W.3d at 579.

In a number of cases, the Court of Criminal Appeals, having addressed the omission

---

[10](...continued)
instruction on false imprisonment required the jury to find that the State had proven beyond a reasonable doubt "(1) that the [D]efendant removed or confined another unlawfully so as to interfere substantially with the other's liberty," and (2) that "the [D]efendant acted knowingly." The trial court further instructed the jury as follows:

> The crime charged in each count is a separate and distinct offense. You must decide each charge separately on the evidence and the law applicable to it. The [D]efendant may be found guilty or not guilty of any or all of the offenses charged. Your finding as to each charge must be stated in your verdict.

[11] Of course, if the jury does receive the instruction required by White, or if the failure to provide a White instruction is determined to be harmless error, then appellate review of the sufficiency of the evidence will be appropriate. See White, 362 S.W.3d at 578.

of the White instruction, conducted proper analyses and remanded for new trials. See, e.g., State v. Davis, No. M2011-02075-CCA-R3-CD, 2012 WL 5947439, at *6 (Tenn. Crim. App. Nov. 16, 2012) (reversing conviction and remanding for new trial because the evidence was subject to differing interpretations and the jury was not instructed on the definition of "substantial interference"); State v. Raymer, No. M2011-00995-CCA-R3-CD, 2012 WL 4841544, at *7 (Tenn. Crim. App. Oct. 10, 2012) (reversing conviction and remanding for new trial because the evidence was subject to differing interpretations and the proper jury instruction could have changed the outcome of the trial); State v. Powell, No. E2011-00155-CCA-R3-CD, 2012 WL 1655279, at *9 (Tenn. Crim. App. May 10, 2012) (same).[12]  In contrast, the Court of Criminal Appeals has also issued several opinions that illustrate when the failure to provide the White instruction may be deemed harmless beyond a reasonable doubt.  In State v. Keller, while addressing the absence of the White instruction as to an especially aggravated kidnapping conviction, the court concluded that the instructional error was harmless beyond a reasonable doubt because it was "clear that the movement and confinement of the victims was not done for purposes of accomplishing assaults upon them."  No. W2012-00825-CCA-R3-CD, 2013 WL 3329032, at *5 (Tenn. Crim. App. June 27, 2013).  The court found that "the record reflects that after the victims had been subjected to threats of deadly force, they were further removed and confined with the intention that they be used as hostages in support of the defendant's efforts to rob [a third party]."  Id. at *4.  Likewise, in State v. Hulse, the Court of Criminal Appeals determined that the absence of the White instruction was harmless beyond a reasonable doubt where the defendant, after raping the victim, chased her with a boxcutter, grabbed her ankles, pulled her down a sidewalk, and prevented her from summoning help.  No. E2011-01292-CCA-R3-CD, 2013 WL 1136528, at *14 (Tenn. Crim. App. Mar. 19, 2013).  Finding that these actions were not inherent in the crimes of rape or aggravated rape, which had already been completed, the court held that "[t]he only reasonable conclusion to be drawn from the evidence is that the [d]efendant's actions were well beyond that necessary to consummate the rape."  Id.

The circumstances here are not so certain.  The proof in this case demonstrated that sometime after midnight on June 26, 2010, the victim drove to the Defendant's residence and walked directly into his bedroom to confront him about his infidelity and to break off their relationship.  At some point she left the residence, but chose to return.  An argument ensued and the two exchanged multiple blows over the course of one to two hours.  The victim acknowledged that she "blacked out" when she got angry, and she could not recall "who hit first."  She maintained that at some point the Defendant threw her onto the bed, but she also

---

[12] While we recognize that the Court of Criminal Appeals did not explicitly state that it was applying a harmless error analysis, it is clear that the principles applied in these opinions were consistent with those we adopted in White and have applied in this instance.

admitted that she threw punches and bloodied the Defendant's lip. When the Defendant left the bedroom to replace his shirt that was torn during the struggle, the victim was able to use her cell phone to dial 911 and, without making a complaint, alert the police dispatcher of her location. Eventually, the Defendant and the victim both "calmed down" and the physical altercation ceased. According to the victim, she lay in bed with the Defendant for some fifteen minutes and planned to leave after he fell asleep, but when the police arrived at the residence, the Defendant "wouldn't let [her] get up and answer the door." She acknowledged that they initially believed the knock at the door may have come from a neighbor, and that the Defendant answered the door after approximately ten minutes. The victim estimated that she attempted to leave three times during the course of the altercation.

A harmless error analysis is necessarily imprecise, requiring that appellate courts assess the cold, written record rather than seeing and hearing the witnesses firsthand. Because of these limitations, we cannot say that the omission of the White instruction qualified as harmless beyond a reasonable doubt. The victim offered conflicting testimony as to who initiated the physical altercation, whether she inflicted wounds upon the Defendant, and when she may have been able to leave the Defendant's residence. The trial judge expressed doubts about the propriety of a separate conviction for false imprisonment, making the following observations at the sentencing hearing:

> [O]n the false imprisonment case there's evidence that the victim went out of the residence one time and then returned. But I guess the overall evidence suggests that that occurred before the injuries were inflicted, before the assault actually occurred.
>
> These two offenses are so intertwined that I think it would be inappropriate to order a consecutive sentence. Because very much like a burglary and robbery might involve a detention of a person against their will for some period of time, it might not justify a separate conviction or . . . consecutive sentences for the kidnapping or false imprisonment aspect of that. And there might not have been a holding or detaining against the victim's will, but for the [D]efendant's reluctance to let officers see her in the condition she was in at that time, emotionally and physically.

(Emphasis added.) Similarly, when discussing his role as the thirteenth juror at the hearing on the motion for a new trial, the trial judge expressed doubt as to whether the confinement was substantial enough to support a separate conviction for false imprisonment:

> I do want to affirmatively express at this time, as the [thirteenth] juror, that the evidence was strong enough to have satisfied this Judge beyond a

reasonable doubt . . . of both the assault and the false imprisonment. And yet, the injuries were not horrible and the victim did take herself voluntarily to his residence, at a very late hour of the night, and left the mobile home . . . at least once during the evening, went to her car, and came back in voluntarily.

. . . .

[T]he point being, she went there voluntarily, she stayed there, she went out, she returned voluntarily, and that probably cut both ways. It showed that at least . . . earlier during the time frame she was there, she was not being falsely imprisoned.

But it did appear from the record that she was being, maybe, held against her will at the time the officers were trying to get [their] attention, even though she'd used her phone to summon the officers by dialing 911 and leaving the line open . . . .

(Emphasis added.)

The record supports this assessment. On one hand, the evidence could support a finding that the Defendant intended only to assault the victim, and that any removal or confinement of the victim—such as dragging her into the bathroom—was in furtherance of that goal, making it essentially incidental to the assault. On the other hand, the evidence could support a finding that the removal or confinement of the victim was greater than that necessary to accomplish the assault, particularly in light of the victim's implication that the Defendant may have prevented her from answering the door when the police arrived. From our review of the record, it is impossible to determine beyond a reasonable doubt whether there was a removal or confinement of the victim that was not essentially incidental to the assault. We cannot, therefore, conclusively say that a properly instructed jury would have found that the Defendant's actions toward the victim constituted a substantial interference with her liberty. See White, 362 S.W.3d at 579 ("In our view, this proof could be interpreted in different ways and, therefore, the determination of whether the removal or confinement of [the victim] constituted a substantial interference with her liberty was a question of fact for the jury to resolve.").

### III. Conclusion

The Court of Criminal Appeals erred by conducting a sufficiency of the evidence analysis rather than a harmless error review. Because the question of whether the removal or confinement of the victim was essentially incidental to the accompanying offense of assault is one for the jury to decide as a matter of fact, and the proof in this case could be

interpreted in different ways, we cannot conclude that the absence of the <u>White</u> instruction was harmless beyond a reasonable doubt. The conviction for false imprisonment is reversed and the cause is remanded for a new trial. The judgment of the Court of Criminal Appeals is affirmed in all other respects. Costs of this appeal are taxed to the State of Tennessee.


_____

GARY R. WADE, CHIEF JUSTICE