IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 5, 2024

## STATE OF TENNESSEE v. JAYLUN MALIK CURRIE

**Appeal from the Circuit Court for Tipton County**
**No. 10493      A. Blake Neill, Judge**

_____

**No. W2023-00698-CCA-R3-CD**

_____

A Tipton County Grand Jury indicted Defendant for especially aggravated kidnapping, especially aggravated burglary, and aggravated assault by strangulation. Prior to trial, counts one and two of the indictment were amended to aggravated kidnapping and aggravated burglary. Following a jury trial, Defendant was convicted of aggravated kidnapping, aggravated assault by strangulation, and aggravated criminal trespass. The trial court sentenced Defendant to an effective eight-year sentence. Defendant appeals, arguing that the evidence was insufficient to support his convictions for aggravated kidnapping and aggravated assault by strangulation. Following our review of the entire record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Joseph B. Simmons, III, (on appeal); Bryan Huffman, (at motion for new trial), Covington, Tennessee; and Frank Deslauriers, Assistant Public Defender (at trial and sentencing), for the appellant, Jaylun Malik Currie.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Mark Davidson, District Attorney General; and Stephanie Draughon and Jason Poyner, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

Around 11:00 p.m. on September 26, 2020, Sierra Gross was at home with her children when someone knocked on her door. She did not have a peephole in her door to see who was outside, but she expected to see the father of her children. However, when she opened the door, she saw that it was Defendant, her ex-boyfriend. The victim was surprised to see Defendant because she had not invited him, and she testified that she probably would not have opened the door had she known it was him. She and Defendant had dated from July or August 2020, until September 2020, but were no longer dating at the time of the incident. The victim recalled that there were "some good, some bad" parts of their relationship, and Defendant began hitting her about a month into their relationship. The victim identified Defendant in open court and testified that Defendant was not on her apartment lease and had previously been banned from the apartment complex.

The victim asked Defendant to leave, but he pushed his way inside. She said Defendant was angry because he thought that she was sleeping with one of his friends. Defendant used a stern voice that was "louder than a whisper, but not just yelling[.]" She recalled that she asked Defendant to "leave plenty of times[,]" but he did not leave "until after everything happened." The victim did not threaten or attempt to call the police because the phone she had was "only on wifi" and could not make calls. She stated that she did not have a phone that could make calls because Defendant had "broke[n] it a couple days before because he was mad." She admitted that she would not have called the police even if she could because she had "never called the police on him" before and "wasn't going to start."

The victim followed Defendant to her bedroom in the back of the apartment to look for something. There, Defendant hit the victim, first on her head, then on her eye. She did not remember if he hit her anywhere else. After Defendant hit her, he "put his hands around [her] neck" and began to choke her on her bed. She could not remember if he used one or two hands. According to the victim, Defendant applied a "[l]ittle bit" of pressure, which the victim rated as "[p]robably six" out of ten. The victim said that she "could breathe, but . . . it was hard to breathe[.]" She had to "gasp for air" when he let her go. She stated that he choked her for about thirty seconds in total, but he was not applying pressure the entire time. The victim did not lose consciousness and did not know what made him let go of her neck. The victim stated that while choking her, Defendant threatened to kill her if she did "something stupid[.]" The victim recalled thinking that she "was fixing to die. [She] thought [she] was going to die that night."

- 2 -

The victim stated that Defendant was not "cussing" at her, but he was "really stern about everything." At one point, Defendant put a belt "around [her] neck and . . . tr[ied] to make [her] walk like a dog" starting in the hallway and moving into the bedroom. She stated that this went on for "[p]robably a minute or two," and Defendant did not tighten the belt around her neck. The victim said that she did not know why Defendant did this, but she "was scared" and "thought [she] was going to die." When asked to describe the incident in one word, the victim replied: "It was traumatic."

The victim stated that she "did not want to be going through that[,]" but she "kn[e]w [she] wasn't able to leave." She explained that because her apartment was on the second floor, she could not exit through the window; she would have had to "go through [D]efendant" to leave the bedroom. However, she stated that she would not have left because her children were in the apartment. She did not fight off Defendant because he was "bigger" and "stronger." The victim testified that she did not feel safe in her home that night. She recalled that after Defendant hit and choked her, he cried and apologized for what he had done and said that he "didn't mean to do it." After Defendant apologized, he left, and the victim was able to leave her bedroom. She agreed that Defendant confined her to her bedroom against her will for about three hours. After Defendant left, the victim went to sleep.

The next day, the victim called her friend and told her what had happened. The victim did not call the police because "[y]ou don't call the cops on somebody you love." The victim said her friend called the police because she would not. When the police arrived, the victim told them what happened and filled out some forms. She did not recall making any mistakes when she filled out the forms; however, she agreed that she did not tell the officers that Defendant displayed a pocket knife to her and that she mentioned the pocket knife for the first time at a prior hearing. After being reminded that she was under oath, the victim affirmed that Defendant possessed a pocket knife on the night of the incident. She explained that Defendant had shown her a "small pocket knife, but he didn't really just try to use it like that." She agreed that he opened the pocket knife in front of her but denied that he used it to intimidate her. She said she did not mention this to the officer because she did not "want [Defendant] to have a charge with a weapon."

The victim testified that she suffered "a black eye and a knot on [her] head and some bruises" on her face and chin, along with some swelling and redness. Her nose was "crooked" and was probably still broken because she had not been to the doctor since the incident. The victim was shown multiple photographs taken the day after the incident depicting her injuries. One photograph showed that she had a black right eye and swelling on her forehead. She noted that her right eye was closed in that photograph but "at one point" it was swollen shut. Other photographs showed bruises on her cheek, chin, neck, and arm. The victim stated that Defendant caused the bruising to her cheek, chin, and neck,

but she was not certain how she got the bruise on her arm, although it was not there before the incident with Defendant.

The victim identified the "assault-victim statement" completed by the responding officers at her apartment the day after the incident and agreed that it was an accurate representation of her answers to the officers. The assault-victim statement was entered into evidence. The victim acknowledged that the statement reflected that she told the officers that Defendant did not use or display a weapon. She affirmed her earlier testimony that Defendant had a weapon. The victim also identified the "strangulation supplement" the responding officer filled out based on her responses and affirmed that the supplement indicated she told officers she felt dizzy during the strangulation and had rapid breathing afterward. The victim clarified that she was dizzy after Defendant hit her, not after he strangled her. The strangulation supplement was exhibited to the victim's testimony.

On cross-examination, the victim acknowledged that she had not originally told the officers about Defendant's possession of the pocket knife. She also acknowledged that the strangulation supplement indicated that she felt "normal" during and after the strangulation/suffocation. She clarified, however, that her answer was in response to how she felt after the strangulation, not during. The victim stated that Defendant did not shake her during the incident, and she agreed that Defendant did not hit her the entire three hours; there were periods of time when they were talking. The victim stated she had not been able to go to the doctor in the year following the incident because she was a single mother who could not hire a babysitter and had to stay with her children "24/7." The victim agreed that the portion of the incident involving the belt had not been recorded in the police reports, but she explained that the reports included only what she told the responding officers, and she did not tell them about the belt incident because her friend already had. The victim stated that she was no longer afraid of Defendant and still loved him, but she was not in love with him. She agreed that when the police arrived she had two cell phones with her but clarified that she had only one cell phone the night of the incident and it could not make calls because it was "only on wifi." The other cell phone was her mother's, which had been brought over the day after the incident.

City of Covington Police Department officer Jeff Norton testified he had previously worked multiple domestic violence cases during his career, and in his experience domestic violence victims are cooperative "[m]ost of the time. Sometimes they're not." Officer Norton was the first responding officer to the victim's apartment at "approximately 1:45" p.m. on September 27, 2020. He recalled that the call came through as an anonymous complaint. When he arrived, the victim and two children were present in the apartment. Officer Norton affirmed that he could "sort of determine already by looking at [the victim] what the complaint was about[.]" He noticed that the victim "appeared to have a black eye" and had bruising "on her cheek along her chin" and "all up and down her arms and

wrist." He further observed "what was consistent with finger marks around her neck. They were very faint." Officer Norton stated that the victim was given medical treatment at the scene, but she declined to be transported to the hospital.

Officer Norton took photographs of the victim's injuries the day after the incident. He noted that the injuries appeared to be worse in person and that the pictures "don't do it justice[.]" Officer Norton took the photographs with a department-issued Motorola cell phone because the department did not issue cameras to officers. The first photograph depicted the victim's right eye bruised and swollen; the second depicted bruising along her cheek and jawline; the third and fourth photographs depicted faint marks around the victim's neck; and the fifth photograph showed bruising on the victim's wrist and forearms. Officer Norton also identified two photographs taken with his body camera, which showed the victim's black eye and the swelling and bruising along her jawline. All of the photographs were exhibited to Officer Norton's testimony.

Officer Norton stated that he had received training on "[m]ore or less what to look for and injuries on the victim and statements from the victim and suspect" in assault and domestic violence cases. He then identified the assault-victim statement he filled out based on the victim's responses to his questions. On the form, he checked the box that indicated the victim had "petechiae to right eye" because "the eye of the victim appeared to have either . . . trauma or petechiae." Officer Norton noted this on the form because, based on his training, "[p]etechiae eye is consistent with strangulation."

Officer Norton described the floor plan of the apartment and the condition of the back bedroom: "[I]t was apparent that the bed, the sheets were all torn off, moved around. It's pretty difficult to describe. It appeared somebody had slept in it and tossed and turned." Photographs of the apartment, including the outside of the building, the front door, the living area, the hallway leading to the back bedroom, and the back bedroom were admitted into evidence.

Based on his observations and his conversation with the victim, Officer Norton determined that "charges of kidnapping, burglary, aggravated burglary, and aggravated assault" were possible. However, another officer made the charging decisions.

On cross-examination, Officer Norton acknowledged that all of his information came from the victim, and he was not aware of anyone in the department speaking with Defendant about the incident. He did not receive information from any other person. He agreed that the victim was cooperative and answered all of his questions. Officer Norton had reviewed the assault-victim statement prior to court and acknowledged that the victim told him that Defendant did not have a weapon. He agreed that it would have been "real[ly]

- 5 -

important" to him to know that Defendant possessed a weapon because it would have impacted how officers approached Defendant.

On re-direct examination, Officer Norton recalled that the victim told him that "she felt like . . . his intentions were to torture her." Officer Norton affirmed that the victim told him she was "held against her will while she was being beaten by [D]efendant[.]"

After a *Momon*[1] colloquy, Defendant chose not to testify and did not put on any evidence. During closing argument, counsel for Defendant stated, "[Defendant] [gave] me permission to admit to assault. It's no doubt she was bruised up. She was hit."

Based on this proof, the jury convicted Defendant of aggravated kidnapping, aggravated criminal trespass, as a lesser-included offense of aggravated burglary, and aggravated assault by strangulation.

After a hearing, the trial court sentenced Defendant to eight years' confinement for aggravated kidnapping, with concurrent sentences of eleven months, twenty-nine days for aggravated criminal trespass, and three years for aggravated assault. On May 8, 2023, the trial court denied Defendant's motion for new trial. Defendant's timely appeal is now properly before this court.

## Analysis

On appeal, Defendant asserts that the evidence was insufficient to support his aggravated assault and aggravated kidnapping convictions; he does not challenge his conviction for aggravated criminal trespass. The State responds that the evidence was sufficient to sustain Defendant's convictions. We agree with the State.

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quotations omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears

---

[1] *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999) (establishing the standard of knowledge a defendant must demonstrate to waive their constitutional right to testify).

the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quotations omitted) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quotations omitted) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

Defendant first argues that the evidence was insufficient to support his conviction for aggravated kidnapping because "the time in which it took to commit the kidnapping did not exceed the time in which it took to commit the assault." Aggravated kidnapping is false imprisonment committed:

(1)    To facilitate the commission of any felony or flight thereafter;

(2)    To interfere with the performance of any governmental or political function;

(3)    With the intent to inflict serious bodily injury on or to terrorize the victim or another;

(4)    Where the victim suffers bodily injury; or

(5)    While the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon.

T.C.A. § 39-13-304(a). False imprisonment occurs when "[a] person . . . knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a). This court has held "that removal or confinement may initially be with the consent of a victim, yet subsequently become unlawful and against the will of

- 7 -

a victim." *State v. Coleman*, No. W2001-01021-CCA-R3-CD, 2002 WL 31625009, at \*6 (Tenn. Crim. App. Nov. 7, 2002).

When a defendant is charged with kidnapping and another crime against the person regarding the same victim, such as assault, the jury must be instructed that it may "return [a] kidnapping conviction[] only [if] the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012); *see State v. Teats*, 468 S.W.3d 495, 502 (Tenn. 2015). The *White* court provided the appropriate instruction a trial court must give to the jury, which was subsequently adopted in the Tennessee Pattern Jury Instructions. *State v. Williams*, No. M2016-00568-CCA-R3-CD, 2017 WL 1063480, at \*4 (Tenn. Crim. App. Mar. 21, 2017) (citing *White*, 362 S.W.3d at 580-81; 8 Tenn. Prac. Pattern Jury Instr. T.P.I. - Crim. 8.03(a)). The inquiry of whether the confinement of the victim was essentially incidental to the underlying felony "is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard." *White*, 362 S.W.3d at 562. "[A]bsence of this instruction, when warranted, results in instructional error that must be subjected to constitutional harmless error review." *State v. Alston*, 465 S.W.3d 555, 562 (Tenn. 2015) (citing *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013)). Here, the *White* instruction was warranted because Defendant was charged with aggravated assault and aggravated kidnapping against the same victim. The record reflects, and Defendant does not contest, that the trial court instructed the jury in accordance with *White*; therefore, the appropriate analysis is under the sufficiency of the evidence standard.

Defendant argues that his case presents a similar issue as that presented in *State v. Cecil*, where the Tennessee supreme court reversed and remanded the defendant's false imprisonment conviction. *Cecil*, 409 S.W.3d at 612-13. First, we note that the present case is factually different because the victim in *Cecil* went to the defendant's residence and also acknowledged that she struck the defendant. *Id.* at 601-03. Here, Defendant forcefully entered the victim's residence, and there is no evidence that the victim struck or otherwise caused harm to Defendant. More importantly, the procedural posture is different in Defendant's case than in *Cecil*. Because the *Cecil* trial occurred prior to *White*, the trial court did not instruct the jury in accordance with *White*. *Id.* at 609. And because *Cecil* was pending on appeal when *White* was decided, the supreme court used plenary review to apply the new rule adopted in *White*. *Id.* at 608-09. The *Cecil* court remanded the conviction for false imprisonment without conducting a sufficiency of the evidence analysis because "the proof in this case could be interpreted in different ways, [and] we cannot conclude that the absence of the *White* instruction was harmless beyond a reasonable doubt." *Id.* at 613. Here, because the jury was instructed in accordance with *White*, our determination is whether the evidence is sufficient to support Defendant's convictions. *See id.* at 612-13 (holding that it was error for the Court of Criminal Appeals

to conduct a sufficiency of the evidence analysis without first determining whether the absence of the *White* instruction was harmless error). Therefore, Defendant's reliance on *Cecil* is misplaced.

On appeal, Defendant does not contest that he confined the victim; instead, he asserts that the confinement was "merely incidental" to the aggravated assault. The aggravated assault of the victim was based on Defendant's choking of the victim, which occurred for approximately thirty seconds out of the three hours that he confined her to her bedroom. As Defendant points out, the victim testified that there were times during the three hours that they were "just talking." However, the victim also testified that she was confined to her bedroom against her will for the entire three hours and could not leave even when they were "just talking." Because the jury was properly instructed pursuant to *White* and the jury is presumed to have followed the trial court's instruction, whether Defendant's removal or confinement of the victim constituted substantial interference with the victim's liberty was a question of fact for the jury to resolve. *See Williams*, 2017 WL 1063480, at *4. Based on the proof at trial, it was reasonable for the jury to find, after consideration of the evidence and the trial court's instructions, that the confinement was longer than necessary for Defendant to commit the aggravated assault of the victim.

Regarding the aggravated nature of the kidnapping, Defendant hit the victim multiple times, choked her, and put a belt around her neck and made her "walk like a dog." Additionally, the victim testified that Defendant had a small pocket knife, which he displayed to her, and Defendant threatened to kill her if she did "something stupid[.]" Officer Norton testified that the victim told him that she felt Defendant's "intentions were to torture her." Finally, the victim described the entire event as "traumatic." The victim suffered bruising on her face, neck, and arms, a "crooked" nose, and a swollen jaw. Based on the victim's testimony it was reasonable for the jury to find that Defendant intended to inflict serious bodily injury or terrorize her, and caused her bodily injury while in possession of a deadly weapon. The evidence supports the jury's finding of any of these aggravating elements. *See* T.C.A. § 39-13-304(a)(3)-(5). Defendant is not entitled to relief on this issue.

Next, Defendant argues that there was insufficient evidence to support his conviction for aggravated assault because there was no evidence that he caused serious bodily injury, and "[i]t is clear that by [the victim's] own conflicting statements in direct and cross[-]examination, she was not strangled within the [statutory] definition[.]" As relevant in this case, aggravated assault is assault that involves strangulation or attempted strangulation. *Id.* § 39-13-102(a)(1)(A)(iv). "Assault occurs when a person '[i]ntentionally, knowingly or recklessly causes bodily injury to another.'" *State v. Maney*, No. M2017-01711-CCA-R3-CD, 2018 WL 3700927, at *3 (Tenn. Crim. App. Aug. 3, 2018) (quoting T.C.A. § 39-13-101(a)(1)). Strangulation occurs when a person:

intentionally or knowingly imped[es] normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person, regardless of whether that conduct results in any visible injury or whether the person has any intent to kill or protractedly injure the victim.

T.C.A. § 39-13-102(a)(2).

Regarding Defendant's first assertion, the State was not required to prove serious bodily injury because Defendant was charged with, and convicted of, aggravated assault by strangulation. Under the statute, strangulation and serious bodily injury are alternative means of establishing the aggravated nature of the assault. *See id.* § 39-13-102(a)(2) (aggravated assault occurs when a person intentionally or knowingly commits an assault that "[r]esults in serious bodily injury to another; . . . *or* [i]nvolved strangulation or attempted strangulation[.]" (emphasis added)).

Moving to Defendant's second argument, aggravated assault by strangulation does not require *serious* impairment of the ability to breathe. Under the statute, strangulation occurred when Defendant applied pressure to the victim's neck and impeded her normal breathing. *See* T.C.A. § 39-13-102(a)(2). The victim testified that Defendant placed his hands around her neck and applied pressure as hard as a "[p]robably [a] six" on a scale of one to ten for "[p]robably about [thirty] seconds." She also testified that she could not breathe normally when Defendant applied pressure, and she "had to gasp for air" when he released her. Further, Officer Norton testified that he observed bruises around the victim's neck that were "consistent with finger marks around her neck."

Finally, Defendant asserts that the victim's testimony was "contradictory and equivocal" regarding strangulation. In returning guilty verdicts, the jury accredited the victim's testimony that Defendant strangled her. *See Bland*, 958 S.W.2d at 659. It is the jury's duty to resolve conflicts in the evidence, and it is not this court's role to substitute its own judgments and inferences for that of the jury. *See Wagner*, 382 S.W.3d at 297. When viewed in the light most favorable to the State, the evidence sufficiently shows that Defendant applied pressure to the victim's neck impairing her ability to breathe normally and causing bodily injury. The evidence is sufficient to sustain Defendant's conviction for aggravated assault by strangulation. Defendant is not entitled to relief.

**Conclusion**

For the foregoing reasons, the judgments of the trial court are affirmed.


_____
JILL BARTEE AYERS, JUDGE