# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Remanded on October 16, 2013

## STATE OF TENNESSEE v. GLENN LYDELL McCRAY

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2362    Monte Watkins, Judge**

---

**No. M2011-02411-CCA-R3-CD - Filed December 6, 2013**

---

The Tennessee Supreme Court has remanded this case for reconsideration in light of *State v. Terrance Antonio Cecil*, No. M2011-01210-SC-R3-CD, 409 S.W.3d 599 (Tenn. 2013). *See State v. Glenn Lydell McCray*, No. M2011-02411-CCA-R3-CD (Tenn. Crim. App. May 2, 2013), *perm. app. granted, case remanded* (Tenn. Oct. 16, 2013). Relevant to the current remand, this court concluded in the previous appeal that although the jury was not properly instructed pursuant to *State v. White*, 362 S.W.3d 559 (Tenn. 2012), regarding the especially aggravated kidnapping conviction, the error was harmless beyond a reasonable doubt and affirmed the judgments of the trial court. Upon further review, we conclude that the omission of the *White* instruction was not harmless beyond a reasonable doubt and that the conviction for especially aggravated kidnapping is reversed, and the case is remanded for a new trial. The remaining judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed in Part and Affirmed in Part; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. THOMAS T. WOODALL, J., filed a dissenting opinion.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher (on appeal), Kristin Neff (at trial), and Joseph Michael Engle (at trial), Assistant District Public Defenders, for the appellant, Glenn Lydell McCray.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Hugh T. Ammerman, III, and Michelle Delgato, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

This case involves convictions for especially aggravated kidnapping, two counts of aggravated assault, and being a felon in possession of a firearm, related to a domestic incident. The trial evidence showed:

Metro Police Officer William Caillouette testified that on June 16, 2010, he responded to a domestic disturbance at 6535 Premier Drive, apartment K-10 in Davidson County and that when he arrived at the scene, he saw the victim and two children, who were upset and running down the steps. He said the victim had visible signs of "being in an altercation." He stated that the victim ran to another officer and that he walked to the apartment. He said he saw the Defendant, who denied doing anything to the victim. He said that the Defendant was sweaty and nervous and that he saw a rifle on the sofa in the living room. The Defendant was placed in a patrol car.

Officer Caillouette testified that he saw bruises on the victim's face, cuts to her lip and forehead, a knot on her head, and a large human bite mark on her leg. He said he spoke with the victim while she was inside the ambulance. He denied looking for a baseball bat at the scene and said a bat was not found. He said another officer found a butcher knife. He identified the rifle and knife. On cross-examination, Officer Caillouette stated that the rifle found at the scene was unloaded and that he did not find any ammunition inside the apartment. He said that he was present when the knife was found.

The victim testified that she and the Defendant dated in March 2010, that she met him through a mutual friend, that his nickname was "Seven," and that they began living together in April 2010. She said that on June 16, 2010, her two children were ages seven and eight and that they lived in the apartment. She said that before June 16, there was no damage to the bathroom doors. She said that on June 15, 2010, a neighbor brought a rifle to the apartment and exchanged it for some of the Defendant's Xanax. She stated that she told the Defendant he did not need the gun and that the Defendant said the gun belonged to him. She said the Defendant took Xanax and drank alcohol that night.

The victim testified that on June 16, 2010, she woke to the sound of the Defendant's pacing the living room floor and he appeared agitated when she attempted to talk to him. Her children were asleep at the time. She said she went to bed the night before the attack between 9:30 and 11:00 p.m. and

denied drinking alcohol that day. She stated that she asked the Defendant what was wrong and that the Defendant hit her with the "butt end" of the rifle without speaking to her. She said she pleaded with him and continued asking what was wrong.

The victim testified that the Defendant wore a pair of jeans and a gray tank top that morning and that the tank top was torn during the fight. She said the Defendant held her while he reached for the side of the couch before striking her with the rifle. She said that after the Defendant struck her twice in the forehead, he said, "[I]f you call the police or . . . tell anybody what I've done, I'm going to kill you and your whole family. And I know where your Momma lives." She said that she "smarted back" and that the Defendant grabbed her by her ponytail and dragged her around the apartment. She said she attempted to call the police from her cell phone when the Defendant was dragging her around the apartment. She said the Defendant grabbed the phone and "split it in half."

The victim testified that the Defendant dragged her into the dining room, kitchen, living room, hallway, and master bedroom. She said that after he dragged her into the master bedroom, the Defendant continued to hit her with the rifle and his hands. She said that the noise woke her children and that her youngest son came to the bedroom door and said, "Seven, please don't hit her again. You're going to kill her and she's all we have. . . ." She said the Defendant stopped hitting her for a few minutes. She said that the Defendant dozed in and out of sleep a few times, that she saw the Defendant's cell phone on the floor, and that she called the police from his phone. She said her children were beside her when she called the police. She said she could not stay on the phone with the 9-1-1 dispatcher because she was locked in the bathroom and heard the Defendant outside the door. She said the Defendant began hitting the door.

The victim testified that the primary damage to the apartment was from the blood on the walls and floor. She stated that blood spatter was in the walk-in closest and the bathroom and that bloody fingerprints were throughout the apartment. She said that when she was inside the walk-in closet, she decided to stop fighting the Defendant. She said that she was lying in the fetal position and covering her head when the Defendant continuously hit her with the rifle. She said she thought she was going to die. She said that at some point she managed to disarm the Defendant, although she did not recall how she did it. She said she pointed the gun at the Defendant and told him that she only

wanted to leave with her children. She denied knowing if the rifle was loaded. She stated that when the Defendant walked toward her, she pulled the trigger but that the gun did not fire. She said she threw the gun to the side and attempted to leave with her children. She said she turned her head and was hit on the left side of her head with a metal baseball bat. She said she could not hear out of her left ear, which was purple from the attack. She said that her hearing was severely impaired after the assault and that she still had twenty percent hearing loss.

The victim testified that she attempted to leave with her children about five times by running to the door. She said that each time they tried to leave, the Defendant said, "I hope you can run faster than these two bullets." She identified the knife found inside the apartment. She said the Defendant held the knife to her throat and threatened to cut her if she attempted to leave. She said the Defendant told her that he loved her and that he did not want her to leave. She said she put up her hand to move the knife from her neck, but the Defendant moved the knife to her neck. She identified a scar on her neck from the Defendant's slightly cutting her neck. She said the wound was not life threatening and was only deep enough to draw a small amount of blood. She said she was afraid for her life when the Defendant held the knife to her neck. She agreed the cut to her neck was accidental.

The victim testified that she heard the Defendant snoring in the living room when she and her children were in the back bedroom. She said they quietly walked down the hallway and into the living room. She said that she watched the Defendant the entire time and that he woke when she turned the door knob. She grabbed her children and ran out the door.

The victim testified that when she gave her statement to the police, she was in shock and disbelief over what the Defendant did to her and her children. She said she told the officer about the gun and the knife but forgot about the bat. She identified photographs of her injuries and said her entire body was bruised. The photographs showed multiple bruises and contusions to her legs and knees, which the victim said were caused by the Defendant's dragging her across the carpet. The photographs showed an injury to her forehead near her hairline, which she said was caused by the Defendant's hitting her with the rifle. The photographs showed a scratch and a bruise to her cheek, a bite mark on her right thigh, two cuts to the back of her head, and scrapes and "rug burns" to her knees. She identified injuries to her left eye and left ear and said one of her teeth was pushed back during the attack. She said

that she underwent two root canals and that the bite mark was still visible on her thigh. She said the bruises in the photographs looked worse two days after the attack.

The victim testified that her neighbor cared for her children while she was hospitalized, that she was evicted, and that she stayed with various family members. She said the Defendant attempted to contact her within two days of the attack while he was in confinement. She said that at the time, she used the Defendant's cell phone. Within two weeks, she spoke to the Defendant four or five times. She said she received collect calls but did not accept the charges. She said the Defendant had his mother call her by three-way calling. She admitted visiting the Defendant in confinement and reconciling with him.

The victim identified a telephone call made by the Defendant on June 25, 2010, which was played for the jury. She identified the Defendant's voice and another male known as BG. The Defendant said to the victim, "I just wanna know you know what I'm saying. Can you just let me loose?" The victim said, "You beat the f--- out of me and almost kill[ed] me. You think I'm going to be with you?" The Defendant told her he loved her, and the victim said, "You don't love somebody when you about to kill 'em." The Defendant apologized.

The victim identified a second telephone call made by the Defendant on June 30, 2010, which was played for the jury. The Defendant told the victim that his mother renewed the "food stamps" and that he was going to receive a car soon. The victim said she did not need any food but agreed to take the food stamp card.

The victim identified a third telephone call made by the Defendant on July 1, 2010, which was played for the jury. The Defendant and the victim discussed their relationship and their love for one another. The Defendant said, "Them charges gonna get dismissed. That dude said that . . . I'm stupid . . . if I cop . . . to something cuz if you don't come to court they gotta dismiss" the charges. The victim said the only reason she appeared in court previously was to obtain her keys. She said she told the prosecutor that she did not want to testify. The Defendant told her to "put that in . . . the letter too. That you were forced" to testify. The victim testified that she could not recall the number of times the Defendant spoke about her not coming to court and that the letter was to the prosecutor. The Defendant told the victim, "You did what

you did. You know you didn't put your hands on me but you did talk back to me and it worked. . . . You put your head down and you did good. I'm proud of you. You did good, you didn't touch me." The victim testified that the Defendant was talking about her not hitting him back during the attack.

The victim identified another telephone call made on July 3, 2010, in which the Defendant told the victim that she could not get into trouble for having a rifle because it was not illegal. He said that the rifle belonged to her and David and that she learned the Defendant could not be around firearms and was going to get rid of it. The victim testified that David was her former boyfriend. The victim expressed concern regarding her being charged with perjury, and the Defendant said she would not be charged with perjury. The victim identified the Defendant's mother's voice, who said that the victim would not be prosecuted for perjury and that the victim needed to tell the police that they loved each other and made a mistake. The Defendant admitted hitting the victim. He said that he had no right putting his hands on her and said,

> I beat you up bad. That's where your bruises, scrapes and all that come from. And you just, just need to let them . . . that's what I did. . . . And I shouldn't did [sic] that so I wanna do time for that. If they make me do the whole 11/29, I will do it. But that other s--- man, don't stress that s--- man. You know what I'm saying.

The Defendant told the victim to tell the prosecutor that he was going to obtain psychiatric treatment and that they were both going to seek counseling. The Defendant asked if the victim obtained a restraining order, and the victim denied obtaining one.

The victim testified that she spoke to a defense investigator and that she changed her version of events. She said she told the investigator that she started the fight with the Defendant, that she obtained the gun from a friend, and that the bite mark was inflicted when she held down the Defendant. She agreed she told the investigator that she could not recall much of what happened in June or July 2010 because of her mental illness and medication. She said she told the investigator that the Defendant did not use a weapon against her because the Defendant kept "hammering" her to tell the authorities

-6-

that he did not use a weapon. She denied being threatened by the police or the prosecutor to testify.

The victim testified that she took medication for epilepsy and paranoid schizophrenia as a result of post-traumatic stress. She denied seeing "a lot of delusions" and said she suffered from bipolar disorder. She denied that her medications impaired her ability to think or perceive reality. She said she suffered from delusions rarely and had to be under a large amount of stress for the delusions to occur. She said her delusions were limited to seeing spiders and hearing someone having a conversation behind her ear.

On cross-examination, the victim testified that a psychiatrist began treating her in April or May 2010 and that she was only taking Saphris for schizophrenia and bipolar disorder on June 16, 2010. She said that although she was acquainted with the man who brought the gun to her apartment the day before the attack, she did not know him well. She said the conversation about trading the rifle for Xanax occurred around 7:00 that night. She said that the man with the rifle came into the apartment, that she asked the Defendant about the gun, that the Defendant said the man wanted to trade the rifle for Xanax, and that she told the Defendant the trade was a bad idea. She denied asking if the rifle was loaded. She said the gun was on the living room table when she went to bed for the night.

The victim testified that she told a defense investigator that the gun was in the house before June 16, 2010, and that she started the fight. She said she and the Defendant reconciled in July and in October 2010. She did not recall writing a letter to the Defendant stating that she should have told the police the truth about the gun. She said that the Defendant wanted her to write a letter to the prosecutor and that he wanted her to send a "test letter."

The victim testified that she and the Defendant did not argue on the evening of June 15, 2010. She said the apartment floors had carpet except for the kitchen and dining room. She said that at 5:00 a.m., she heard the Defendant picking up and placing his beer bottle on the glass coffee table. She said he appeared intoxicated, did not stumble, and spoke clearly. She did not recall whether the Defendant hit her with his hands or with the rifle first. She denied she was under the effects of her medication when she woke that morning.

The victim testified that the Defendant dragged her through the apartment by one of her legs while hitting her with the rifle. She agreed she did not testify at the preliminary hearing about the Defendant's dragging her and said it was a difficult day. She did not recall whether she told the defense investigator that the Defendant dragged her. She thought she told the hospital staff about the Defendant's dragging her but was not sure. She first refused medical treatment because she was concerned about her children and wanted to go home. She said she told the domestic violence coordinator and the prosecutor who handled the preliminary hearing about the Defendant's dragging her.

The victim testified that the Defendant had sickle cell anemia, that he dozed off during the attack, and that the Defendant was "fully awake" when he grabbed the baseball bat. She said the knife came from a kitchen drawer and denied retrieving it. She said she first saw the knife when she walked down the hallway and attempted to leave the apartment because she thought the Defendant was asleep. She said the Defendant held the knife to her throat for a few seconds. She said that when the Defendant dropped the knife, he sat down on the sofa and told her to go to the bedroom. She said she complied.

The victim testified that she attempted to leave the apartment immediately after the first few blows because the Defendant did not have hold of her. She denied attempting to escape when the Defendant dragged her. She denied the Defendant's aiming the gun at her. She said the Defendant had the gun on his lap the last time she saw it. She said she last saw the baseball bat in the bedroom. She denied knowing where the knife was but said the Defendant held it to her throat in the hallway.

The victim testified that she last called 9-1-1 when the Defendant was in the living room dozing in and out of sleep. She said that when she left the apartment, the Defendant was on the sofa. She agreed that they reconciled in June 2010 and that their relationship ended in February 2011. She said that the Defendant was jealous and that they previously argued over a male friend. She denied having a sexual relationship with this friend in February 2011, although the Defendant thought otherwise. On redirect examination, the victim stated that her children and the Defendant were the only people inside her apartment when she woke on June 16, 2010.

The victim's medical records were received as an exhibit. The victim had facial and scalp swelling, back pain, a post-traumatic headache, a cerebral concussion, contusions to the face and scalp, a chest wall injury, a mild elevated heart rate, a bite laceration to the thigh, and multiple lacerations to the face and scalp. No fractures were found, but an extracranial soft tissue hematoma and possible laceration to the right side of the head were identified.

Metro Police Officer James McDugle testified that he responded to a domestic disturbance at the victim's apartment, that the Defendant was in custody when he arrived at the scene, and that the victim was in the ambulance. He said he assisted the other officers in looking for evidence. He said he found the knife in the kitchen sink. On cross-examination, Officer McDugle stated that he was instructed to search the apartment for a gun and a knife. He did not recall being told to search for a baseball bat and said he did not find a bat. He did not recall whether the recovered knife was bloody or wet.

Metro Police Crime Scene Investigator Lisa Whitaker testified that she took photographs of the victim at the hospital at 6:05 a.m. She said the victim told her that her boyfriend struck her with a rifle, a bat, and a knife.

Metro Police Officer Thomas E. Simpkins testified that he took photographs of the rifle found at the scene and processed it for fingerprints. He said that he did not find any fingerprints on the rifle, which was common because of the stock and [grip's] texture. He said that ninety percent of the time he was unable to identify fingerprints on a gun. He denied analyzing the gun for the presence of blood because he was not asked to perform the test. He said it was possible that blood could be on an item, though not visible.

On cross-examination, Officer Simpkins testified that he did not expect to find any fingerprints on the gun. He said that had someone grabbed the metal barrel of the gun, fingerprints might not be found because fingerprints do not stay on hard objects long. He denied knowing what occurred at the scene. He said that he did not see blood on the gun and denied that he was asked to examine the knife and baseball bat for fingerprints. He said he was only asked to process the gun for fingerprints.

Heather Wayman testified that on June 16, 2010, she lived at Rural Hills Apartments with her son and that the Defendant and the victim lived above her apartment. She said that on June 16, she awoke to the sound of

someone being beaten and that she heard yelling and screaming coming from the victim and the Defendant's apartment. She said she got out of bed and walked to the living room where the majority of the noise was centered. She said she called 9-1-1 when she heard the victim's children. She said she heard noise coming from the living room, dining room, and bedroom for about ten to fifteen minutes.

Ms. Wayman testified that she heard the Defendant say, "You're not going nowhere." She said the Defendant "told the children to shut up and sit down, get in their rooms." She said the Defendant told the victim repeatedly that he was going to kill her. She said that the victim tried to leave but that the Defendant would not allow it and took her car keys. She said she heard the Defendant say, "[D]on't open that door again," and "Leave the d--- door alone." She said she heard one of the victim's children say, "[C]ome on, Momma. I can't leave you." She heard the children crying and screaming for their mother.

Ms. Wayman testified that she heard the victim coming down the stairs, that she opened her apartment door, and that she told the victim and the children to come inside. She said the victim was bleeding from her mouth, ear, and head. She said the bruising was worse days after the attack. She said that the victim left her apartment and that an ambulance took her to the hospital. She said she cared for the children while the victim was treated at the hospital. She said that she saw the Defendant when the police took him into custody and that the Defendant did not have any injuries. She did not notice if the Defendant's hands were bloody.

Ms. Wayman testified that after the attack, the victim asked her to search the victim's apartment for the victim's keys but that she did not find them. She said that during her search, she found the Defendant's clothes and a metal baseball bat under the clothes. She said she saw blood in the closet, bathroom, hallway, bedroom, and living room. She said she took the bat to her apartment, kept it there for a few hours, and threw it in the trash. She said she threw it away because she feared the Defendant's coming home and using it again. She said she saw the Defendant use the bat several times.

On cross-examination, Ms. Wayman testified that she heard the yelling for about ten to fifteen minutes before she called 9-1-1. She said the victim came to her apartment after being released from the hospital to get her children. She stated that she entered the victim's apartment around 7:00 or

-10-

8:00 a.m. after the attack and that she threw away the bat a few hours later. She said the blood she saw inside the victim's apartment was on the walls and the floor. She said she heard the children yelling from her living room and could not recall where the Defendant was when she heard him talking. She said the majority of what she heard was clear. On redirect examination, Ms. Wayman stated that when she was inside the apartment, she noticed a hole in one of the bathroom doors.

Metro Police Officer Matthew Barnes testified that he saw the Defendant at the scene and did not notice any injuries to him. He said he saw a gun in the living room and blood on the living room floor in front of the couch. He denied searching the apartment for other evidence. On cross-examination, Officer Barnes stated that he did not write a report but that he talked to the officer who wrote an incident report.

Metro Police Officer Marsha Brown testified that she spoke with the victim on June 28, 2010, and that she requested DNA and fingerprint analyses of the gun found at the scene. A recording of her conversation with the victim was played for the jury.

The victim told Officer Brown that she and the Defendant began dating in March and moved into the apartment in April. The victim said that the Defendant hit her with a rifle and a baseball bat and that she did not know why she did not mention the bat at the scene. She said she was distraught and placed in the ambulance quickly. She said the rifle belonged to a friend who came to the apartment the night before the attack, but she also said the Defendant told her the gun was his. She denied that the gun was hers and said that she had not owned a firearm in years. The victim told Officer Brown that she woke to the Defendant's pacing in the living room, that she asked him what was wrong, that he "went crazy," that he dragged her by her hair around the apartment, and that he beat her with the rifle. She said she was able to get the rifle away from the Defendant, but he grabbed the baseball bat. She told Officer Brown that her neighbor took the bat from the apartment after the police left and that the neighbor still had it. She denied that the Defendant's brother stayed at their apartment before the attack, although one of the Defendant's brothers visited the apartment the day before the attack.

On cross-examination, Officer Brown testified that she discussed with Officer Simpkins possible contamination on the rifle because the Defendant and the victim touched it. She stated that the rifle was never tested for DNA

-11-

and that she did not request testing on the knife. She agreed the victim did not mention a knife during their conversation.

The jury found the Defendant guilty of especially aggravated kidnapping, two counts of aggravated assault, and being a felon in possession of a firearm. The trial court sentenced him to an effective forty-six-year sentence.

*State v. Glenn Lydell McCray*, No. M2011-02411-CCA-R3-CD, slip op. at 2-10 (Tenn. Crim. App. May 2, 2013) (*"McCray I"*), *perm. app. granted, case remanded* (Tenn. Oct. 16, 2013).

In its order granting the Defendant's application for review pursuant to Tennessee Rule of Appellate Procedure 11, the supreme court stated that the case was remanded to this court "in light of" *Cecil. State v. Glenn Lydell McCray*, No. M2011-02411-SC-R11-CD (Tenn. Oct. 16, 2013) (order). We note that the Defendant was convicted of four offenses: especially aggravated kidnapping, two counts of aggravated assault, and being a felon in possession of a firearm. The *Cecil* decision is relevant to the especially aggravated kidnapping conviction, and we limit our consideration in this remand accordingly.

As we discussed in the previous appeal, in *State v. White*, our supreme court promulgated a new method for analyzing whether dual convictions of a kidnapping offense and another felony are permitted on due process principles. *See State v. White*, 362 S.W.3d 559 (Tenn. 2012) (*overruling State v. Richardson*, 251 S.W.3d 438 (Tenn. 2008); *State v. Fuller*, 172 S.W.3d. 533 (Tenn. 2005); *State v. Cozart*, 54 S.W.3d 242 (Tenn. 2001); *State v. Dixon*, 957 S.W.2d 532 (Tenn. 1997); *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991)). Previously, an appellate court was required to conduct a due process inquiry in order to determine whether dual convictions were constitutionally permissible. *See, e.g.*, *Richardson*, 251 S.W.3d 438. In *White*, the court said that a separate appellate due process analysis is not necessary. The court held that the inquiry "is a question for the jury after the appropriate instructions," with appellate review of the sufficiency of the evidence serving as the due process protection. *White*, 362 S.W.3d at 577-78; *see Cecil*, 409 S.W.3d at 609 ("Only when the jury is properly instructed can appellate review of the sufficiency of the convicting evidence satisfy the due process safeguard.").

*White* held that a proper jury instruction must "define the key element–substantial interference with the victim's liberty–as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." *Id.* at 580. To that end, *White* provided an interim jury instruction and invited the Tennessee Pattern Jury Instruction Committee to develop an instruction for use in trials in which a

-12-

defendant is indicted for kidnapping and an accompanying felony. *See id.* at 580-81. Following *White*, the committee approved this instruction:

> To find the defendant guilty of [especially] [aggravated] [kidnapping] [false imprisonment], you must also find beyond a reasonable doubt that the removal or confinement was to a greater degree than that necessary to commit the offense(s) of _____ as charged [or included] in count(s) _____. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> (a) the nature and duration of the alleged victim's removal or confinement by the defendant;
>
> (b) whether the removal or confinement occurred during the commission of the separate offense;
>
> (c) whether the interference with the alleged victim's liberty was inherent in the nature of the separate offense;
>
> (d) whether the removal or confinement prevented the alleged victim from summoning assistance, although the defendant need not have succeeded in preventing the alleged victim from doing so;
>
> (e) whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and
>
> (f) whether the removal or confinement created a significant danger or increased the alleged victim's risk of harm independent of that posed by the separate offense.
>
> Unless you find beyond a reasonable doubt that the alleged victim's removal or confinement exceeded that which was necessary to accomplish the alleged _____ and was not essentially incidental to it, you must find the defendant not guilty of [especially] [aggravated] [kidnapping] [false imprisonment].

*Cecil*, 409 S.W.3d at 607 (quoting 7 T.P.I.–Crim. 8.01-.03, 8.05 (footnote omitted) (citing *White*, 362 S.W.3d at 578-81)).

In the Defendant's previous appeal, we determined that although the trial took place before the *White* decision, appellate review of the jury instruction for the Defendant's especially aggravated conviction should be conducted pursuant to *White*. *McCray I*, slip op. at 12. Our decision to apply *White* in *McCray I* proved correct because in *Cecil*, the supreme court noted that *White* did not "preclude consideration of the newly required instruction in cases already in the various stages of the appellate process." *Cecil*, 409 S.W.3d at 608.

In *McCray I*, we noted that the trial court gave the following instruction:

> Any person who commits an especially aggravated kidnapping is guilty of a crime.

> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

> (1) that the defendant knowingly removed or confined another unlawfully so as to interfere substantially with the other's liberty;

> and

> (2) that the confinement or removal was accomplished with a deadly weapon or by display of any article used or fashioned to lead the alleged victim to reasonably believe it was a deadly weapon.

> A removal or confinement is "unlawful" if it is accomplished by force, threat[,] or fraud.

This instruction is consistent with the pattern jury instruction as it existed at the time of the trial. *See* 7 T.P.I.–Crim. 8.03 (15th ed.). In addition, the court gave a special instruction:

> The offense of especially aggravated kidnapping does not require a finding that the defendant moved the victim any specific distance or confined her in any particular place or restrained her for any particular length of time in order for the defendant's actions to substantially interfere with her liberty.

As in *McCray I*, we conclude that the trial court erred in its jury instructions. We note that in addition to the absence of the *White* instruction detailing how the jury should consider "substantial interference," the special instruction misled the jury about the necessity that the removal or confinement of the victim must have been of a greater degree than was necessary

-14-

to commit aggravated assault. *See White*, 362 S.W.3d at 576. The post-*White* pattern instruction advises the jury:

> Although the law requires no specific period of time of confinement or distance of removal, a removal or confinement "interferes substantially" with another's liberty *if the time of confinement is significant or the distance of removal is considerable.*

7 T.P.I.–Crim. 8.01-.03, 8.05 (17th ed.) (footnote omitted) (emphasis added).

Having again concluded that the trial court erred in its jury instructions, we must reexamine whether the error was harmless beyond a reasonable doubt. *See Cecil*, 409 S.W.3d at 607-13. We note the factual similarities between this case and *Cecil*, in which the supreme court said the instructional error was not harmless beyond a reasonable doubt. In *Cecil*, the defendant was convicted of domestic assault and false imprisonment following an altercation in the defendant's home. The victim testified that she went to the defendant's house to confront him about his infidelity. She said that they argued and that when she tried to leave, the defendant told her she was not going anywhere. She said that the situation escalated physically, that the defendant "came after" her, that he grabbed her and threw her on the bed, that they exchanged blows, and that she kicked him in order to get him off her. She claimed she tried to leave, but the defendant grabbed her hair and took her to the bathroom, where he "slammed" her against the bathtub and said he would kick her face. She said that eventually, the defendant allowed her to stand. She claimed she tried to leave three times during the altercation, which she said lasted one and one-half hours. She admitted, though, that her testimony had been inconsistent about whether she could have left before, during, or after the altercation. At one point when the defendant went to another room to change his ripped shirt, the victim called 9-1-1. The victim admitted she stayed in bed with the defendant after the altercation while they both calmed down. She said that the police arrived about fifteen minutes after her 9-1-1 call, that the defendant would not let her answer the door, and that about ten minutes passed before the defendant answered the door.

The victim in *Cecil* admitted she "blacked out" because she was in a rage and could not recall whether she or the defendant hit the other first. She admitted that she had a history of fighting and that she tended to have blackouts when she was angry. She admitted sending the defendant a text message days after the incident in which she said she would "beat[] his a-- again" if she got in trouble for being around him. She admitted going to the defendant's house, trying to rekindle their romantic relationship, and asking him for money for her children after the incident. She admitted she took medication for anxiety. Another person who was at the defendant's house on the night of the incident testified that the victim stayed

at the house about fifteen or twenty minutes, left for five minutes, and returned. He claimed he did not hear any arguing but said he was sleeping. *See Cecil*, 409 S.W.3d at 600-04.

The *Cecil* court noted the absence of the *White* instruction, which it said was error because the jury was not instructed on substantial interference with the victim's liberty, a material element of the offense of false imprisonment. *Id.* at 610. The court said that the touchstone of determining whether the error was harmless beyond a reasonable doubt "is whether a rational trier of fact could interpret the proof at trial in different ways." *Id.* In *Cecil*, the proof was capable of more than one interpretation regarding "whether there was a removal or confinement of the victim that was not essentially incidental to the assault." The court held, therefore, that the defendant was entitled to a new trial on the false imprisonment charge. *Id.* at 613.

Returning to the present case, the evidence showed that the victim and her children were at home with the Defendant, who had been drinking alcohol and using Xanax, when the Defendant struck the victim with the butt of a rifle and told her he would kill her family and her if she called the police. She said she tried unsuccessfully to leave. After she "smarted back," the Defendant dragged her by her hair through several rooms in the apartment, continuing to assault her with the rifle and his hands as she lay on the floor in the master bedroom closet. The Defendant dozed a few times, and the victim eventually took his cell phone and called 9-1-1. She said she and her children left the apartment while the Defendant was asleep in the living room. At some point during the incident, the victim locked herself in a bathroom. The victim also said she took the rifle from the Defendant, pointed it at him, and attempted to fire it, but she did not recall how she got the gun from him. She testified that the Defendant hit her head with a baseball bat, but she acknowledged she did not tell the police initially about the baseball bat. She said that she tried to run from the apartment with her children about five times but that the Defendant threatened to kill her each time. She said the Defendant held a knife to her throat during the altercation and said he would cut her if she tried to flee.

The victim admitted that she told an investigator that she started the fight, that she obtained the rifle from a friend, and that she had a bite mark from when she held down the Defendant. She told the investigator she had little memory of the incident because she took medication and had bipolar disorder and paranoid schizophrenia from post-traumatic stress. She admitted she had "delusions" involving spiders and hearing voices. A neighbor heard the Defendant telling the victim's children to be quiet, sit down, and go to their rooms. She heard the Defendant repeatedly state that he would kill the victim and instruct someone to leave the door alone. The neighbor said she went in the Defendant and the victim's apartment after the incident and disposed of the baseball bat to prevent the Defendant from using it again.

When we considered the effect of the instructional error in *McCray I*, we said, "The proof overwhelmingly established that the victim's confinement went beyond that necessary to accomplish the aggravated assault." *McCray I*, slip op. at 15. According to *Cecil*, though, our inquiry should have been whether the proof was capable of more than one interpretation regarding "whether there was a removal or confinement of the victim that was not essentially incidental to the assault." *Cecil*, 409 S.W.3d at 612. As *Cecil* emphasized, it is the duty of a properly instructed jury to assess whether the evidence establishes every element of kidnapping, "with the appellate courts assessing the sufficiency of the convicting evidence as the ultimate component of due process protections." *Id*. at 607.

Upon reconsideration, we conclude that the evidence that might support a finding of a kidnapping, although in our view substantial, is capable of more than one interpretation. The State presented evidence that the Defendant kept the victim in the apartment during assaults that involved a rifle, his fists, a knife, and a baseball bat. The victim's testimony was vague and incomplete regarding the sequence of the events. The victim's credibility was vigorously challenged, and her inconsistent statements, lack of memory, and mental health issues were before the jury for its consideration. Had the jury been properly instructed, it could have concluded that the State failed to show removal or confinement of the victim by the Defendant that interfered with the victim's liberty beyond that necessary for the Defendant to assault the victim. We conclude, therefore, that the error was not harmless beyond a reasonable doubt. The Defendant's especially aggravated kidnapping conviction must be reversed, and he must receive a new trial at which the jury is instructed in accord with *White*.

In consideration of the foregoing and the record as a whole, the especially aggravated kidnapping judgment is reversed, and the case is remanded for a new trial on that count. The judgments for two counts of aggravated assault and being a felon in possession of a firearm are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-17-