IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 18, 2018

### STATE OF TENNESSEE v. LARRY FRANKLIN MANN

**Appeal from the Circuit Court for Grundy County**
**No. 31CC1-2001-CR-1705        Buddy D. Perry, Judge**

———————————————————

### No. M2017-01929-CCA-R3-CD

———————————————————

The Defendant, Larry Franklin Mann, appeals his convictions following a jury trial in 2001 for attempted first degree murder, aggravated assault, and especially aggravated kidnapping, for which he received an effective sentence of twenty-five years. On appeal, the Defendant maintains that the trial court erred in failing to instruct the jury in accordance with *State v. White*, 362 S.W.3d 559 (Tenn. 2012). We conclude that the trial court's failure to issue the instruction was harmless beyond a reasonable doubt, and we, therefore, affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT H. MONTGOMERY, JR., JJ., joined.

B. Jeffery Harmon, District Public Defender; and Francis W. Pryor, Jr. (at trial) and Robert G. Morgan (on appeal), Assistant Public Defenders, for the appellant, Larry Franklin Mann.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Mike Taylor, District Attorney General; and Steve Strain, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This direct appeal involves the trial court's failure to issue a jury instruction at the Defendant's 2001 trial in accordance with a Tennessee Supreme Court opinion that was filed more than ten years after the Defendant's trial. The facts presented at trial established that on February 23, 2001, the Defendant procured a butcher knife, kidnapped

his former girlfriend, and repeatedly stabbed her when police officers arrived. The trial was held in November 2001, and the sentencing hearing occurred in April 2002.

In May 2002, trial counsel filed a timely motion for new trial. The hearing on the motion was not held until August 22, 2017, and the trial court entered an order denying the motion on September 15, 2017. The appellate record reflects no reason why the motion languished in the trial court for more than fifteen years before it was heard, and we cannot perceive any circumstance that would justify such a delay. We note that the Defendant filed multiple pro se motions throughout the years in an attempt to move his case forward, but his motions were apparently ignored by trial counsel, the prosecutor, and the trial court. In one such motion, the Defendant stated that trial counsel wrote him a letter acknowledging that the motion for new trial was still pending. However, trial counsel took no action to have the motion heard.

During the time in which the Defendant's motion for new trial sat dormant, the law regarding dual convictions for kidnapping and a separate felony offense changed. At the time of the Defendant's trial, a separate due process review was required when a defendant challenged dual convictions involving a kidnapping offense and a separate felony offense. *See State v. Dixon*, 957 S.W.2d 532, 533 (Tenn. 1997); *State v. Anthony*, 817 S.W.2d 299, 306 (Tenn. 1991). At trial, the Defendant challenged his charge for especially aggravated kidnapping as violating his due process rights pursuant to *Anthony*. In 2012, the Tennessee Supreme Court released its opinion in *State v. White* in which the court overruled *Anthony* and its progeny and rejected a separate due process analysis. *White*, 362 S.W.3d at 578.

In *White*, our supreme court held that when kidnapping is charged with another underlying offense, the General Assembly intended to punish kidnapping only in instances where the "removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." *Id*. at 577. Whether such confinement is sufficient to support a separate conviction for kidnapping is a question of fact for the jury to resolve after a proper instruction. *Id*. Trial courts should instruct the jury to determine "whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." *Id*. at 578.

Our supreme court developed a jury instruction to facilitate the jury's determination of whether a defendant's removal and confinement of a victim was sufficient to support a separate conviction for kidnapping. *Id*. at 580-81. Both *White* and the Tennessee pattern jury instruction developed after *White* include factors that the jury should consider in determining whether the removal or confinement was to a greater degree than that necessary to commit the underlying offenses:

- 2 -

(a) the nature and duration of the alleged victim's removal or confinement by the defendant;

(b) whether the removal or confinement occurred during the commission of the separate offense;

(c) whether the interference with the alleged victim's liberty was inherent in the nature of the separate offense;

(d) whether the removal or confinement prevented the alleged victim from summoning assistance, although the defendant need not have succeeded in preventing the alleged victim from doing so;

(e) whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

(f) whether the removal or confinement created a significant danger or increased the alleged victim's risk of harm independent of that posed by the separate offense.

Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 8.01-.03 (footnotes omitted); *see White*, 362 S.W.3d at 580-81.

Prior to the hearing on the motion for new trial, the Defendant amended his motion to include the trial court's failure to give a *White* instruction. The holding in *White* applies to cases that were in the "appellate pipeline" when *White* was filed on March 9, 2012. *State v. Cecil*, 409 S.W.3d 599, 608 (Tenn. 2013). Because the Defendant's motion for new trial was pending when *White* was released, the holding in *White* applies to the Defendant's case. As *White* was released more than ten years after the Defendant's trial, the trial court understandably did not give the jury a *White* instruction. The Defendant appears to argue in his appellate brief that the trial court's failure to give a *White* instruction results in an automatic reversal of his conviction for especially aggravated kidnapping. However, we must review the evidence presented at trial to determine if the trial court's failure to provide a *White* instruction is harmless beyond a reasonable doubt. *Cecil*, 409 S.W.3d at 610.

## TRIAL

The evidence presented at trial established that the Defendant and the victim were in a relationship that ended in December 2000, and the victim was living with Mr. Billy

Burnett when the offenses occurred on February 23, 2001. On the evening of the offenses, the victim was at home and had intended to go to the grocery store. The victim saw the Defendant crouched down by a planter outside her front door and holding a butcher knife. The victim used the telephone by the front door to call the Monteagle Police Department. She testified that she was afraid that the Defendant would hear her and that she whispered, "Help," to the person who answered her call. The Defendant came up from behind the victim, grabbed the telephone out of her hand, and threw it out into the yard. While holding the knife, the Defendant grabbed the victim's wrist and told her that if the police arrived, he would kill her. He stated that he had told his son earlier that he was going to kill the victim. The Defendant continued to hold the knife while the victim pleaded with him and asked him why he was doing this. He repeated that he would kill her if the police arrived and said, "[L]et's go." At one point, the Defendant searched through the victim's purse for the keys to Mr. Burnett's truck parked in front of the house, but the victim hid the keys under the cushion on the couch. The victim did not see the Defendant's vehicle outside her home.

The Defendant took the victim to the bedroom where he tied her arms with a rope. The victim testified that she recognized the rope as coming from the Defendant's home and that the knife that the Defendant was holding did not come from her home. The Defendant "jerked" the victim's shorts down, threw her on the bed, and took off his pants. The victim begged him not to hurt her and told him that if he untied her hands, she would try to find the keys to Mr. Burnett's truck. The Defendant cut the rope with the knife, and the victim pulled up her shorts. The Defendant grabbed the victim by the arm and dragged her to the living room. He continued to repeat, "[L]et's go. If the law pulls up[,] I'm going to kill you."

The Defendant again searched the victim's purse for the keys but was unable to find them. He dragged the victim to Mr. Burnett's truck, opened the driver's side door, and threw the victim into the truck. When the victim told the Defendant that she did not know where the keys to the truck were, he dragged the victim back inside the house and to the bedroom where he searched a chest of drawers for the keys. The Defendant took the victim back into the living room and repeated, "Let's go." The victim testified that she attempted to stall the Defendant. She told him that she needed to get her medicine before they left or that she would die. The Defendant took the victim into the kitchen and retrieved her insulin, syringes, and alcohol swabs and put them in his pocket.

The Defendant forced the victim outside and toward a barn located behind the house. When the victim told him that was not the way to the Defendant's home, he said, "Shut up, … let's go." The victim tried to pull away from the Defendant, who was holding the knife and told her, "Let's go … or I'm going to kill you." The victim begged the Defendant not to hurt her. She then saw a light and glanced around to see the police

arriving. The Defendant stabbed the victim in her left side and back while the victim tried to escape. The victim testified that the Defendant took his knife and was "ramming it, ramming it." She fell to the ground, and the Defendant stabbed her in the arm and ran away. She heard a voice ask what happened, and she stated that she had been stabbed by the Defendant. The victim suffered a collapsed lung and remained hospitalized for fifteen days. She underwent two operations during which doctors removed her spleen and repaired her intestines.

On cross-examination, the victim testified that when the Defendant entered her home, he did not say that he would force her to go to his home with him. She acknowledged that approximately thirty minutes had passed between the Defendant's entering her home and stabbing her near the barn.

Ms. Wanda McDaniel, a dispatcher with the Monteagle Police Department, received a call on February 23, 2011, at 5:37 p.m., during which she heard a female say, "Help," in a low voice. She then heard a male voice say, "Shut up, b****. I will kill you." Ms. McDaniel gave the telephone to Monteagle Police Officer Ken Tuders to listen while she attempted to trace the call. While listening to the call, Officer Tuders heard a male voice state, "If you don't go with me, I'll stab you." He also heard a female voice but was unable to understand anything that was said.

Ms. McDaniel asked Marion County 911 to trace the call, but the office did not have the technology to do so at that time. Monteagle Police Officer Carl Seagroves searched a telephone book in an effort to determine who was assigned the telephone number from which the call originated. He determined that the telephone number belonged to Mr. Burnett, and the local telephone company provided him with Mr. Burnett's address.

Officer Seagroves and Officer Tuders went to the scene. While they were approaching the house, Officer Seagroves heard a woman pleading for help and saw two people struggling with each other by a gate. Officer Seagroves saw the man make a forward stabbing motion and the woman fall to the ground. Officer Seagroves ran toward them while yelling, "Police, stop." He also yelled for Officer Tuders to come behind the house. Officer Tuders saw a man, later identified as the Defendant, climb the gate and jump to the other side. Officer Seagroves chased after the Defendant while Officer Tuders tended to the victim. Officer Tuders testified that he asked the victim what happened and that the victim said, "He's killed me. He's killed me." She identified the Defendant as her attacker and told Officer Tuders that her back was hurting. Officer Tuders rolled her over and attempted to stop the bleeding. An ambulance was dispatched to the scene.

Officer Seagroves chased the Defendant behind the barn, into an open field, and across a small creek. The officer yelled, "Stop, police." The Defendant stopped and turned around, and the officer instructed the Defendant to get on the ground. The Defendant stated, "Just kill me." Officer Seagroves handcuffed the Defendant and led him back to the scene. The Defendant had a "scabbard-type" knife that resembled a pistol on his belt and a pocketknife and red rope in his pocket. He also had a bottle of insulin and needles in his coat pocket. A butcher knife was located on the other side of the gate. In the victim's bedroom, Officer Tuders located a rope on a dresser and a piece of rope on the floor.

Officer Tuders interviewed the Defendant and advised him of his rights. As the Defendant made a statement, Officer Tuders wrote the statement on a form. Officer Tuders did not have the Defendant read and sign the written statement. On cross-examination, Officer Tuders testified that while the Defendant was "forthcoming," he was also nervous and upset, and the officer believed that the Defendant had been drinking alcohol. Officer Tuders said he advised the Defendant of his rights both before and after taking the statement. He asked the Defendant if the information in the written statement was correct, and the Defendant "didn't disagree."

Monteagle Police Chief Lee Parker arrived at the scene while Officer Tuders was caring for the victim and Officer Seagroves was chasing the Defendant. After the Defendant was captured and interviewed, the Defendant asked Chief Parker to take him by the Defendant's home. Chief Parker testified that the Defendant's home was located approximately one mile from the victim's home and that he had to cross the interstate to drive to the Defendant's home. A blue truck registered to the Defendant was parked at his home. Chief Parker located a knife sharpener on the Defendant's coffee table.

Chief Parker later learned that while the Defendant had signed the waiver of rights form, he had failed to sign his statement that was on the other side of the form. Chief Parker visited the Defendant at jail and advised him of his rights, and the Defendant agreed to talk to him. Chief Parker gave the Defendant the opportunity to change or correct his statement, and the Defendant did not make any changes. The Defendant then signed the statement.

Chief Parker read the statement at trial. The Defendant stated that he left his house to see the victim. He said that upon arriving at the victim's home, he waited outside at a corner in front of the house. Once the victim opened the door, the Defendant entered the house. The Defendant said the victim told him not to hurt her and that she loved him. He stated that he told the victim that he loved her too and asked her to return home. He acknowledged that he was holding a butcher knife and said he wished he had discarded it. The victim said she needed her insulin, and they went outside to the truck.

- 6 -

The Defendant stated that he held the victim by the hand and that he was still holding the butcher knife. He said they returned inside to retrieve the victim's purse. He maintained that the purse fell on the couch when he attempted to hang it around the victim's neck. They returned outside while the Defendant was holding the victim's hand and the butcher knife. He stated that they walked down by the barn, that he saw the police arrive, that he stabbed the victim, and that he told her that she had called the police.

The Defendant testified in his own defense and stated that the victim moved out of his home in December 2000 and that he begged her to return whenever he saw her. The victim, however, had already arranged to move in with another man. The Defendant testified that on the date of the offense, he purchased a twelve-pack of beer at approximately 9:00 a.m. and drank three beers while at home. He then traveled to Winchester, Tennessee, to visit his son, but his son was not at home. The Defendant returned home at around 1:30 or 2:00 p.m. and remained there until 4:00 or 4:30 p.m., during which time he drank six more beers. He then went to "the Depot." He stated that he had a butcher knife and nylon stringer cord with him because he planned to make throw lines and a stringer on which to string fish. He then decided to go talk to the victim.

The Defendant testified that upon arriving at the victim's home, he stood outside because he did not know whether Mr. Burnett was there. The victim came outside on the porch while holding a telephone. The Defendant stated that "[e]vidently the phone got dropped on the ground," that he took the victim by the hand and that they went inside the house. The Defendant asked for the keys to Mr. Burnett's truck and told the victim that he wanted to talk to her and wanted her to return home. The Defendant denied cursing at the victim. He said he dumped the contents of the victim's purse on the coffee table while searching for the keys. He stated that he retrieved the victim's medication because she once told him that she would die without it. He said that at one point, he wrapped the nylon cord around the victim's hands but that he did not know why he did so. He maintained that he immediately cut the cord off her hands.

The Defendant stated that he was in the home for approximately thirty minutes. He explained that he and the victim went toward the barn because he thought the victim may have called Mr. Burnett and that Mr. Burnett might show up at the house. He acknowledged that he stabbed the victim when the police arrived and said he did so because he was afraid. He maintained that he told the victim that he did not want to hurt her, that he loved her, and that he wanted her to return home with him. He also maintained that he did not intend to hurt the victim when he went to her home and that he was sorry for doing so. He stated that he ran from the police officers because he was afraid and that he did not recall telling Officer Seagroves to kill him.

On cross-examination, the Defendant denied retrieving the butcher knife with the intention of taking it to the victim's house. He acknowledged that he displayed the knife when he went to the victim's house and that he kept it in his hand during the entire episode. He denied threatening the victim with the knife. He maintained that he took the victim out toward the barn intending to let her go and then leave. He acknowledged that the victim did not want to go with him. He also acknowledged that he stabbed the victim because she called the police, but he denied that he meant to kill her. The Defendant also presented three witnesses who testified that the Defendant had a reputation for being truthful.

At the conclusion of the proof, the jury convicted the Defendant of attempted first degree murder, aggravated assault, and especially aggravated kidnapping. The trial court imposed concurrent sentences of twenty-five years for the attempted first degree murder and especially aggravated kidnapping convictions and three years for the aggravated assault conviction.

## HARMLESS ERROR ANALYSIS

The State contends that based upon the evidence presented at trial, the trial court's failure to provide a *White* instruction was harmless beyond a reasonable doubt. The trial court's failure to issue a *White* instruction to the jury is a non-structural constitutional error that requires reversal unless the State demonstrates that the error was harmless beyond a reasonable doubt. *Cecil*, 409 S.W.3d at 610 (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). In determining whether the error is harmless, we must ask "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* (quoting *Rodriguez*, 254 S.W.3d at 371). "[T]he touchstone of this inquiry is whether a rational trier of fact could interpret the proof at trial in different ways." *Id.* (citing *White*, 362 S.W.3d at 579).

The evidence presented at trial established that approximately thirty minutes passed between the Defendant's entering the home and his stabbing the victim. The victim testified that, prior to the stabbing, the Defendant entered her home with a butcher knife, attempted to prevent her from summoning help by discarding her telephone in the yard, forced her into the bedroom, tied her up, removed her clothing, dragged her throughout the house, attempted to force her to leave the home in Mr. Burnett's truck, and forced her to go with him toward a barn located behind her home against her will. The Defendant acknowledged that during this time, he was constantly armed with a butcher knife, tied the victim's hands with rope, and searched her purse for Mr. Burnett's keys. He also acknowledged that he took the victim toward the barn while armed with the butcher knife and that she did not want to go with him. It was only after the Defendant saw the police arrive that he stabbed the victim. Such evidence

- 8 -

overwhelmingly establishes that the Defendant's removal or confinement of the victim was greater than necessary to commit the offenses of attempted first degree murder and aggravated assault. A rational trier of fact could not have interpreted the proof at trial in different ways. Accordingly, we conclude that the trial court's failure to instruct the jury in accordance with *White* was harmless beyond a reasonable doubt.

## CONCLUSION

Upon reviewing the record and the applicable law, this court affirms the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE