IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2019

**STATE OF TENNESSEE v. RASHARI JONES**

**Appeal from the Criminal Court for Shelby County**
**No. 16-06503    Chris Craft, Judge**

———————————————————

**No. W2018-02180-CCA-R3-CD**

———————————————————

A Shelby County grand jury indicted the defendant, Rashari Jones, for attempted first degree murder, aggravated assault while acting in concert with two or more persons, and employing a firearm during the commission of a dangerous felony. Following a trial, a jury found the defendant guilty of attempted voluntary manslaughter, aggravated assault, and employing a firearm during the commission of a dangerous felony, and the trial court imposed an effective sentence of six years in confinement followed by four years of supervised probation. On appeal, the defendant contends the trial court erred in allowing the State to cross-examine the defendant regarding his whereabouts preceding the shooting, in finding the defendant was engaged in unlawful activity and omitting the "no duty to retreat" language from the self-defense instruction, and in failing to merge his convictions for attempted voluntary manslaughter and aggravated assault. We conclude that although the self-defense instruction was erroneous, the error was harmless. Therefore, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

John McNeil, Memphis, Tennessee, for the appellant, Rashari Jones.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy Weirich, District Attorney General; and Devon Lepeard and Paige Munn, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

***Facts and Procedural History***

On July 24, 2016, the victim, Travian Thompson, was scheduled to take his daughter to her mother, Janeika Brown's, house following his weekend visitation. However, Ms. Brown called the victim and warned him not to bring their daughter home that night because the defendant, Ms. Brown's boyfriend, had threatened to shoot the victim if he came to their house. Because of the defendant's threat, the victim and his daughter stayed at the victim's house. The following morning, the victim's daughter disclosed to the victim that the defendant was "beating on her" when Ms. Brown was not present. Worried for his daughter's safety, the victim dropped her off at daycare and called Ms. Brown to discuss the allegations. Because the defendant was still at home, Ms. Brown told the victim she would call him back after the defendant left.

Later that day, while the victim was at work, Ms. Brown called and advised the victim it was safe to come by and talk. Nicholas Cooper, who was giving the victim and Jasen Meadow a ride home from work, agreed to take the victim to Ms. Brown's house. When they arrived, Mr. Cooper and Mr. Meadow waited in the truck while the victim went inside to speak with Ms. Brown. Neither the victim nor his companions were carrying weapons.

Because the defendant had threatened him the night before, the victim believed the defendant and Ms. Brown were setting him up and searched the house to ensure the defendant was not there. Afterward, the victim asked their daughter to tell Ms. Brown what she had disclosed about the defendant, and their daughter confirmed the defendant hit her when Ms. Brown was not present. During the conversation, the victim noticed Ms. Brown was holding her cellphone but did not know what she was doing with it.

While Mr. Meadow was waiting for the victim to return to the truck, he noticed a white car drive past Ms. Brown's house several times and called the victim, warning him about the suspicious vehicle. Because the victim did not immediately exit the house, Mr. Meadow called him again and told the victim that they needed to leave. As the victim was standing in the doorway preparing to leave, the white car quickly pulled into the driveway. The defendant and two men exited the car with guns drawn and ran toward Mr. Cooper's truck. However, after realizing the victim was not in the truck, the three men turned and rushed toward the house. The defendant entered the house and approached the victim, asking him to come into the front yard to fight. The defendant's gun was aimed at the victim's head, and the victim could see a bullet loaded in the chamber. The victim, who was backed up against a couch and had nowhere to run, pushed his daughter out of the way and ducked as the defendant fired the gun. The victim saw blood on his daughter and initially believed she had been shot. However, as he was examining her, the victim noticed blood dripping from his shoulder and realized the bullet had struck him near his collarbone.

When Mr. Cooper heard the gunshot, he drove the truck up to the street because he and Mr. Meadow were afraid the defendant would come after them. However, when the defendant and his friends fled, Mr. Cooper returned to Ms. Brown's house to check on the victim. Mr. Meadow helped the victim into Mr. Cooper's truck, and they rushed to Methodist South Hospital. However, because of the seriousness of his injuries, the victim was airlifted to the Regional Medical Center, and Mr. Cooper and Mr. Meadow remained behind to speak with police. In addition to taking Mr. Cooper's and Mr. Meadow's statements, officers searched Mr. Cooper's truck but did not recover any weapons.

Officer Dennis Williams, Jr. with the Memphis Police Department ("MPD") responded to the shooting call at Ms. Brown's residence. When Officer Williams arrived on the scene, the victim, the defendant, and Ms. Brown were not present. Officer Williams secured the scene and spoke with J.T. Brown, Ms. Brown's father, who stated he was in a back room and did not see the altercation. A short time later, Ms. Brown returned to the house; however, Officer Williams did not speak with her.

Officer Tristan Brown with the MPD Crime Scene Unit arrived at the residence and processed the scene, photographing and collecting all evidence, including a spent .40-caliber shell casing outside the front door of Ms. Brown's house, which was consistent with the shooter firing his weapon near the area of the front door. Officer Brown also photographed several spots of blood on the floor near the living room couch.

Detective Clifton Hobson initially went to the victim's hospital room but was unable to speak with him. Detective Hobson later learned the defendant's name from a fellow officer's report and prepared a photographic lineup from which the victim identified the defendant as the shooter.

At trial, the State called Travian Thompson, Jasen Meadow, Nicholas Cooper, Officer Dennis Williams, Jr., Officer Tristan Brown, and Detective Clifton Hobson as witnesses, and all rendered testimony consistent with the foregoing. J.T. Brown testified he was at Ms. Brown's house the night before the shooting and heard the defendant threaten to shoot the victim. The next day, Mr. Brown decided to visit his daughter after work, and, when he arrived, he observed her and the victim arguing about their daughter. The victim was "rambling and raging with [a] gun in his hand." Mr. Brown, who sat on the couch with his grandchildren, told the victim to "cut that out," and Ms. Brown asked the victim to leave because the defendant was on his way. The victim was standing near the doorway, as if he were waiting for the defendant, and, when the defendant entered the house, the victim backed up against the couch. Both the defendant and the victim had their guns tucked in their waistbands and argued for "about 30, 40 seconds" while Ms. Brown tried to intervene. Suddenly, the defendant said "take this b***h a** n***a" and

shot the victim. The defendant ran from the house, and the victim staggered toward Mr. Brown and said, "No, he didn't shoot me." Mr. Brown acknowledged he initially told the police he was in the back room during the altercation because he did not want to get involved. He also agreed he did not tell police the victim was walking through the house before the altercation.

Janeika Brown testified she has one child with the victim and two children with the defendant. The evening before the shooting, Ms. Brown called the victim and told him not to bring their daughter home because the defendant had threatened to shoot the victim. Instead, the victim took their daughter to daycare the following morning, and Ms. Brown brought her home later that day. The victim was angry because he was not able to take his daughter to Ms. Brown's house the night before and texted Ms. Brown several times throughout the day, telling her what he was going to do to the defendant. Later, he called Ms. Brown and told her to open her front door. She opened the door, and the victim, who told Ms. Brown he had "popped five or six pills," entered her house "with [his] gun out" and began "flipping the mattresses." Ms. Brown and her father told the victim to leave, but he turned to their daughter and began questioning her about whether the defendant had ever hit her. Ms. Brown texted the defendant, told him the victim was there, and asked whether he "whooped" the victim's daughter. The defendant responded, "Here I come."

Approximately five minutes later, the victim, who was standing at the front door, said, "[H]ere go the b***h a** n***a right here." Ms. Brown jumped off the couch and saw the defendant and his two friends jump out of a white car. The defendant stood in the front yard and asked the victim to come outside. However, Ms. Brown stepped in between them to prevent an altercation. The victim began fidgeting with his gun, which was tucked in his waistband, "like he wanted to pull it out." As the defendant turned to leave, the defendant pulled his gun out of his waistband and shot toward the victim, hitting him in the chest. After shooting the victim, the defendant left in the white car, and the victim's friends drove the victim to the hospital. Ms. Brown initially followed the victim to the hospital but turned around after a few minutes and drove back to her house. Following the shooting, the defendant repeatedly texted Ms. Brown, accusing her of bringing the victim to their house.

Ms. Brown acknowledged she did not tell police that the victim came in her house with his gun out or that he went through the house flipping the mattresses. She stated she purposely left this information out of her statement because she was mad at the defendant. While Ms. Brown acknowledged she had told police that the defendant and his friends came out of the car pointing guns, she testified at trial that she did not see the defendant's friends with guns. Additionally, Ms. Brown told the police that the defendant "just walked up to [the victim] and shot him in the chest," but, at trial, she

testified that statement was not true. Ms. Brown also acknowledged paying the defendant's credit card bills and attorney fees. On cross-examination, Ms. Brown testified she told a police officer on the scene that the victim pulled a gun on the defendant during the altercation.

The defendant called Officer Germi Weatherby with the MPD, who testified he arrived on the scene following the shooting and spoke with Ms. Brown. Ms. Brown told Officer Weatherby the victim arrived at her house uninvited and unannounced with a gun. Additionally, Ms. Brown stated the victim pulled his gun on the defendant but the defendant was able to shoot first. On cross-examination, Officer Weatherby acknowledged he was unaware of the defendant's threat to shoot the victim the previous night.

The defendant testified on his own behalf, asserting he acted in self-defense. At the time of the shooting, the defendant lived with Ms. Brown, his two children, and Ms. Brown's daughter with the victim. The defendant testified he and the victim had a "mutual understanding" and were not mad at each other prior to the altercation. The night before the shooting, the defendant and Ms. Brown had an argument, and Ms. Brown brought up the victim to make the defendant jealous. The defendant denied threatening to shoot the victim but told Ms. Brown that she was going to "get [the victim] hurt."

The next day, the defendant asked a friend's brother to drop him off at a girlfriend's house so she could braid his hair. While he was having his hair done, Ms. Brown sent multiple text messages accusing the defendant of cheating on her. Later, the defendant called the friend to pick him up, and, on the way home, the defendant received a text from Ms. Brown asking whether he hit the victim's daughter. The defendant thought Ms. Brown was trying to start a fight, so he replied he "was about to pull up." The defendant denied hitting the victim's daughter, stating he does not even "whoop[]" his own children. The defendant also denied he and his friends circled his house several times. Because the house is near busy streets, the defendant testified it would take approximately ten minutes to circle back to the house each time.

When the defendant pulled into the driveway, he first noticed Mr. Cooper's truck parked on the street. The defendant approached the truck and asked the passengers, "Y'all straight?" The person in the passenger seat replied, "Man, lil bruh we don't even know you," which gave the defendant a "bad vibe." The defendant testified he had a gun tucked in waistband when he approached the truck but denied pointing it at the passengers, and, while he had no felonies on his record that would prevent him from legally purchasing or carrying a gun, the defendant admitted he was carrying the gun without a permit.

- 5 -

The defendant then walked to the front door, and the victim yelled for his friends to get out of the truck. The defendant told the victim to come outside but the victim refused, threatening to kill the defendant for hitting his daughter. The defendant then opened the screen door and walked inside the house. The victim was "going insane," and Ms. Brown tried to intervene, telling the victim to put his gun down. Fearing for his life, the defendant reached for his gun, turned to the side, and shot toward the victim. However, the defendant testified he wasn't trying to kill the victim but only wanted to get out of the house safely. After exiting the house, the defendant ran toward his friend's car. Ms. Brown also ran out of the house, and the defendant confronted her, asking whether she had told the victim to come over. Later, when he learned that detectives wanted to speak with him, the defendant turned himself in, claiming he shot the victim in self-defense after the victim pulled a gun on him.

On cross-examination, the defendant acknowledged he and Ms. Brown have a tumultuous relationship, and Ms. Brown sometimes uses the victim's name to make him jealous. The defendant agreed he was also seeing Brianna Byers and was at her house on the day of the shooting. However, he stated he did not get the text about hitting the victim's daughter until he was on his way home and denied Ms. Byers begged him to stay at her house. The defendant testified he refused to name the people he was riding with on the day of the shooting because he did not want them to be falsely accused of committing a crime like he was.

Following deliberations, the jury found the defendant guilty of the lesser-included offenses of attempted voluntary manslaughter and aggravated assault and the charged offense of employing a firearm during the commission of a dangerous felony. Following a sentencing hearing, the trial court imposed an effective sentence of six years in confinement followed by four years of supervised probation. The defendant filed a motion for new trial which the trial court denied. This timely appeal followed.

*Analysis*

On appeal, the defendant argues the trial court erred in allowing the State to cross-examine him about his interactions with Brianna Byers on the day of the shooting, in finding he was engaged in unlawful activity and omitting the "no duty to retreat" language from the self-defense instruction, and in refusing to merge his convictions for attempted voluntary manslaughter and aggravated assault. The State contends the trial court properly allowed the State to cross-examine the defendant, modified the self-defense instruction, and refused merger.

I.      **Cross-Examination of the Defendant**

The defendant argues the trial court erred in allowing the State to cross-examine him concerning his interactions with Ms. Byers on the day of the shooting. The defendant contends the line of questioning was irrelevant and prejudicial, and its only purpose was to highlight "potential character or moral flaws." The State asserts the questions were probative of the defendant's relationship with Ms. Brown and his whereabouts preceding the shooting, and, even if the probative value were low, there was no unfair prejudice.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse of discretion. *See State v. Clayton*, 535 S.W.3d 829, 859 (Tenn. 2017). This Court finds an abuse of that discretion when the trial court applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

Here, when cross-examining the defendant regarding his tumultuous relationship with Ms. Brown, the State asked the defendant if he were also seeing Ms. Byers. The defendant objected to the question's relevance, and the parties had the following exchange with the trial court during a bench conference:

THE COURT: What is this relevant to show?

[PROSECUTOR]: Where he potentially was right before he went to the house and shot [the victim].

THE COURT: Where would that be?

[THE PROSECUTOR]: At Brianna's house.

THE COURT: And that is you're offering to show what a motive for the witness yesterday to lie?

[PROSECUTOR]:  Because we may have other evidence that could come out depending on what his answers are.

THE COURT:  Well, we're talking about relevance here in this strategy. So the question is going to be are you – I mean, what is that being offered to prove?  The fact that – let's say that he was there what would that prove? I mean, just let me know where you're headed.

. . .

[PROSECUTOR]:  We believe it would be relevant because he's saying he was one place right before the shooting when he may have been at that place, but we may have proof and a witness to say that she begged him not to go indicating circumstantially that he intended – bad intent when he left after getting texted when he kept going back to the house indicating premeditation.

THE COURT:  So you're saying this would go to his state of mind?

[PROSECUTOR]:  Uh-huh.

. . .

[DEFENSE COUNSEL]:  I don't think where he was has anything to do with this.  I think it's prejudicial in as far as them trying to paint [the defendant] as not being faithful.

[PROSECUTOR]:  That's not really my intent.

THE COURT:  I'm not sure anybody in this case is being faithful.

[DEFENSE COUNSEL]:  I mean, he has already said that he was at a friend girl's house getting his hair done.

. . .

THE COURT:  All right.  I'm going to allow them to ask this question because although it's not a lot of [great] probative value I don't think that any unfair prejudice substantially outweighs the probative value.  So I'll allow it.

[PROSECUTOR]: While we're here my follow up question would be would she have begged you not to leave her house that day.

THE COURT: By she you're meaning?

[PROSECUTOR]: Brianna.

THE COURT: Brianna. Not would she or did she?

[PROSECUTOR]: Did she?

THE COURT: Okay. Because would she would [] violate 602 lack of personal knowledge.

[PROSECUTOR]: Did she.

[DEFENSE COUNSEL]: I think –

THE COURT: That's not hearsay – it's not a declaration. It's an interrogatory. So I'll allow that question as well.

Following the bench conference, the State asked the defendant if he was at Ms. Byers' house on the day of the shooting, and the defendant agreed Ms. Byers was the person braiding his hair that day. However, he denied being with Ms. Byers when he received the text message from Ms. Brown regarding the victim's daughter and stated Ms. Byers did not beg him to stay at her house.

Although the probative value of the State's questions was minimal, we agree with the trial court that the defendant's whereabouts and actions immediately preceding the altercation with the victim were relevant to show the defendant's state of mind. The questions were also related to prior testimony regarding the tempestuous relationship between Ms. Brown and the defendant. Ms. Brown sent the defendant text messages on the day of the shooting and the prior evening accusing him of cheating on her. The defendant also testified Ms. Brown frequently brought up the victim to make the defendant jealous, and she texted the defendant on the day of the shooting to let him know the victim was at their house. Moreover, the line of questioning was brief, and the State moved on following the defendant's denials that he was with Ms. Byers when he received the text regarding the victim's daughter or that Ms. Byers begged him to stay.

While the defendant argues the unfair prejudice stemming from the State's questions outweighs the probative value, we are not persuaded. The defendant had

already admitted to being at a girlfriend's house on the day of the shooting, and the State's questions merely confirmed the name of the friend and his location at the time of Ms. Brown's text message. Based upon the evidence presented above, the trial court did not abuse its discretion when allowing the State to question the defendant regarding Ms. Byers, and the defendant is not entitled to relief on this issue.

## II.     Self-Defense Instruction

The defendant contends the trial court erred in finding he was engaged in unlawful activity and omitting the portion of the self-defense instruction stating he had no duty to retreat. Specifically, the defendant argues he was not in unlawful possession of a weapon because he was on his property at the time of the shooting. The State contends the trial court properly modified the jury instruction. While we conclude the trial court erred in finding the defendant was engaged in unlawful activity, as we will discuss below, the error was harmless.

It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." The trial court's duty to fully instruct the jury extends to general defenses, including self-defense. *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013). *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will only be considered prejudicially erroneous if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this Court 'must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008) (internal quotations omitted)). Questions concerning the propriety of jury instructions are reviewed de novo with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

As relevant to this case, Tennessee Code Annotated section 39-11-611(b)(1)-(2) provides that:

> (1) A person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening

or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) A person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

In *State v. Perrier*, 536 S.W.3d 388 (Tenn. 2017), our supreme court clarified that "the phrase 'not engaged in unlawful activity' is a condition on a person's statutory privilege not to retreat" rather than a complete bar to self-defense. *Id.* at 401. "[A] duty to retreat does not mean that a person cannot defend herself or himself." *Id.* at 404. Consistent with the common law duty to retreat, a defendant engaged in unlawful activity "'must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of'" using force. *Id.* (quoting *State v. McCray*, 512 S.W.2d 263, 265 (Tenn. 1974)). The trial court must make a threshold determination of whether a defendant was "engaged in unlawful activity" as part of its decision whether to charge the jury with the no duty to retreat. *Id.* at 403.

Here, the trial court found the defendant was engaged in unlawful activity when he carried a concealed weapon without a permit. Therefore, the trial court removed the language in the self-defense instruction stating the defendant did not have a duty to retreat before using force. However, the trial court did not instruct the jury that the defendant had a duty to retreat, and the State did not argue during closing arguments that the defendant had a duty to retreat. The defendant objected to the removal of the "no duty to retreat" language, arguing he was on his own property at the time of the shooting.

It is an offense to carry or possess a firearm "with the intent to go armed." Tenn. Code Ann. § 39-17-1307(a)(1). However, it is a defense to §39-17-1307 if the person is at their place of residence or premises. *Id.* § 39-17-1308(a)(3)(A), (C). Although testimony differed as to whether the defendant was in the front yard, on the porch, or inside the house, it is clear the defendant was either at his place of residence or on his premises when he shot the victim. The proof at trial clearly established that the defendant

was not engaged in unlawful activity at the time of the shooting and, therefore, had no duty to retreat. Accordingly, the trial court erred in removing the "no duty to retreat" language from the self-defense instruction.

We must now consider whether the defendant was prejudiced by the error. Errors in jury instructions are subject to a "harmless error" analysis. *Hawkins*, 406 S.W.3d at 128 (citing *State v. Williams*, 977 S.W.2d 101, 104-05 (Tenn. 1998)). The test to determine whether the error is harmless is "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013) (quoting *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)).

Here, the evidence of the defendant's guilt is overwhelming, and the trial court's omission was harmless beyond a reasonable doubt in the context of the entire instruction. The jury heard testimony that the night before the altercation the defendant threatened to shoot the victim if he came to Ms. Brown's house, and the defendant acknowledged threatening the victim, telling Ms. Brown she was going to "get [the victim] hurt." The victim went to Ms. Brown's house on the day of the shooting to discuss allegations that the defendant had hit the victim's daughter. Ms. Brown testified she texted the defendant, told him the victim was at their house, and asked if he had hit the victim's daughter. The defendant, who admitted he was carrying a gun, and two friends arrived at his house a few minutes later. The victim testified he was standing in the doorway of the house as the defendant ran toward him with his gun drawn. After a short verbal altercation, the defendant shot the victim in the shoulder and fled. The defendant testified he shot the victim to protect himself because the victim was pulling out his gun, and both Mr. and Ms. Brown testified the victim was armed. However, the jury also heard the victim deny having had a gun, that Mr. and Ms. Brown initially told police the victim was not armed, and that no gun was found during the police investigation. By convicting the defendant of attempted voluntary manslaughter, the jury obviously concluded the defendant acted as a result of a state of passion produced by adequate provocation, and it rejected the defendant's self-defense theory that he reasonably believed he was in imminent danger of death or serious bodily injury and that the danger was real, or believed to be real, based upon reasonable grounds. Accordingly, we conclude the trial court's omission of the "no duty to retreat" language from the instruction on self-defense had no impact on the jury's verdict and was harmless beyond a reasonable doubt.

## III.    Failure to Merge Convictions

The defendant argues the trial court erred in failing to merge his convictions for attempted voluntary manslaughter and aggravated assault. Although the defendant

concedes the convictions do not merge under the *Blockburger*[1] test, he asserts his dual convictions essentially "mean that he shot the victim a single time with the dual intention of causing bodily injury and killing the victim."  The State contends the trial court properly declined to merge the defendant's convictions.  We note our supreme court has previously determined that dual convictions for attempted voluntary manslaughter and aggravated assault do not violate double jeopardy.  *State v. Feaster*, 466 S.W.3d 80, 87 (Tenn. 2015) (holding, although the defendant's convictions for attempted voluntary manslaughter and aggravated assault arose out of the same act or transaction, "each of these offenses contains numerous elements that the other does not").  The defendant is not entitled to relief on this issue.

### *Conclusion*

Although the self-defense instruction was erroneous, we conclude the error was harmless.  Therefore, based on the aforementioned reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE

---

[1] *Blockburger v. United States*, 284 U.S. 299 (1932).